Edward W. ANSPACH, Appellant,

v.

UNITED STATES of America, Appellee.

Walter F. TURNER, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 6720, 6721.

United States Court of Appeals Tenth Circuit.

June 27, 1962.

Certiorari Denied Oct. 8, 1962.

See 83 S.Ct. 46.

Arthur Warner, Los Angeles, Cal. (S. Ward Sullivan, Beverly Hills, Cal., was with him on the brief), for Edward W. Anspach.

John J. Dunn, Denver, Colo., for Walter F. Turner.

Yale Huffman, Asst. U. S. Atty. (Lawrence M. Henry, U. S. Atty., was with him on the brief), for appellee.

Before LEWIS and BREITENSTEIN, Circuit Judges, and RITTER, District Judge.

LEWIS, Circuit Judge.

The critical question presented by this appeal is whether evidence obtained by the intentional eavesdropping of government agents, unaccompanied by physical trespass upon constitutionally protected premises and unaided by the use of electronic or mechanical device, is admissible in federal prosecutions. Appellants contend broadly that the Fourth Amendment is a bar to the use of evidence obtained by eavesdropping and more specifically that the Fourth Amendment prohibits "the revelation of the intimacies of one's castle (when) supported by some slight proof of conduct on the part of a government officer that is not entirely 'cricket.'" We find merit

to neither contention as applied to the facts in the cases at bar.

Appellants were indicted under a thirteen-count indictment alleging the mailing of separate pieces of mail in the perpetration of a scheme to defraud in violation of 18 U.S.C. § 1341.[1] They were convicted and sentenced to two-year sentences on twelve of the counts to run concurrently.

It was charged and proved to the jury's satisfaction that the appellants entered a scheme to organize and incorporate a small business loan service company, known as Beneficial Business Loan Service Corporation, hereafter referred to as BBLSC. By direct mail to small business owners, BBLSC represented that it had money available for loans which were not obtainable at local banks; that an advance fee was necessary to initiate processing of the desired loan, but that if the loan application were not accepted, the entire fee would be returned. Thereafter, salesmen were employed and instructed to offer false and misleading information at variance with the carefully worded written contract, to the effect that BBLSC had untold sums of money at its disposal; that over ninety percent of the applications of business owners which were accepted by the company had resulted in the conclusion of loans; that the advance fee paid by the business owner was to protect BBLSC in the event that the business owner refused to accept the loan once his application was processed and the loan obtained for him. The salesmen were equipped with a list of lenders, the names of which

1. "Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

were merely copied from the telephone book; a letter from the Better Business Bureau, the reproduction and use of which was expressly forbidden; some false photostatic copies of letters of rejections and returned checks.

Although the corporation grew to national proportions opening branch offices in various parts of the country, there is no evidence of the completion of any loans. There is a great deal of evidence of instances where the company accepted the advance fee and never returned it nor completed the loan. When complaints arrived at the company's office, letters were sent stating that the salesmen had no authority to vary the terms of the printed contracts and again assuring the would-be borrowers that they would receive their loans.

The sufficiency of the evidence is not now questioned and claim of error is limited to the admissibility of a portion of the testimony of government witnesses Marshall, Johnson and Perkins. Marshall, a postal inspector, testified that he had engaged a hotel room in California by prearrangement with one Russell, a former employee of BBLSC. Russell took an adjoining room where he had arranged a meeting with appellant Anspach. Two doors separated the adjoining rooms and it was possible for the witness to overhear much of the conversation in Russell's room by opening the door on the one side and sitting close to the door opening on Russell's room. Russell made demands upon Anspach for money due him, refusing to deliver certain files of loan applicants until the money was paid. The witness testified:

"A. I heard Mr. Russell, whose voice I knew, tell Mr. Anspach the contracts were there in Los Angeles, these client contracts which had been down at Morgan Engineering Company, and were shipped back.

"Some discussion went on that I didn't hear, and I heard Mr. Anspach laugh very loudly and jovially, and say, 'You just keep them. This thing couldn't have worked out better for me if I had planned it. This is just what I want. You just keep the contracts.'

"And I heard him laugh when he said that. He said, 'Russ, it couldn't have been better for me if it was planned.'"

The interpretive impact of the Fourth Amendment guaranteeing the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" is undoubtedly now in the process of judicial modernization found necessary by changing conditions. See Lanza v. New York, 82 S.Ct. 1218. Traditionally the concept of an invasion upon the right of privacy was premised within the theories of the law of trespass. Thus, the earlier cases refused to extend the meaning of "persons, houses, papers, and effects" or to apply "searches and seizures" to forbid hearing and sight. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, left the problem of telephone wire tapping to the interdiction of subsequent legislation. And, although the Federal Communications Act outlawed the evidence obtained by wire tapping, the use of a detectaphone applied to the wall of an adjoining room to pick up one side of a telephone conversation violated neither the Act nor the Fourth Amendment, Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322.

Considerations of the value of the right of privacy inspired thought-provoking dissents by Justice Brandeis in Olmstead and Justice Murphy in Goldman. And appellants would read the philosophy of these dissents into the rationale of the recent cases of Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734, where the Court reversed a judgment of conviction where evidence was obtained through an electronic device which penetrated the wall. Under the circumstances of an actual physical intrusion upon the defendant's premises, the Court refused to re-examine its holdings in Goldman and On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270, summarizing them

as standing for the proposition that evidence obtained by eavesdropping is admissible where "the eavesdropping had not been accomplished by means of an unauthorized physical encroachment within a constitutionally protected area." Silverman v. United States, 365 U.S. at p. 510, 81 S.Ct. at p. 682.

Although the "spike mike" of the Silverman case may have refined somewhat the definition of physical intrusion, courts of appeal which have considered Silverman have found no vacillation in the guiding principle. United States v. Kabot, 2 Cir., 295 F.2d 848; Carnes v. United States, 5 Cir., 295 F.2d 598; Todisco v. United States, 9 Cir., 298 F.2d 208. The present case offers little reason to explore the ramifications of slight physical intrusion in operation in Silverman, for no electronic device was used and the eavesdropping was accomplished without resort to any physical intrusion upon the domain of another. If the use of this evidence were held not permissible, the scope of the protection of the Fourth Amendment, which the Supreme Court has long struggled to define, would be broadened to amorphism. Eavesdropping in any form carries with it the stigma of impoliteness and is not "cricket" in the realm of social intercourse. But the prevention and detection of crime is not a polite business and we see no need or justification for reading into the Fourth Amendment a standard of conduct for law enforcement officials which would leave society at the mercy of those dedicated to the destruction of the very freedoms guaranteed by the Constitution. The "pursuit of happiness" referred to by Justice Brandeis in Olmstead can be destroyed by idealistic theory that shuns the deadly realism of crime. We do not consider the conduct of the agents in the case at bar to violate the compulsion of the Fourth Amendment or, indeed, to be even subject to criticism

■ Appellants also complain that the testimony of the witnesses Johnson and Perkins introduced evidence of misconduct on the part of appellant Turner un-

related to the charges of the indictment. Johnson and Perkins were not named as victims of the fraudulent scheme in the indictment, but their testimony was that they had been contacted by Turner after mailing to BBLSC the inquiry solicitation and showed Turner's active participation in offering false and fraudulent inducements. The evidence was within the charge of the indictment relating a scheme to defraud certain named victims and "divers other persons to the grand jury unknown"; the testimony cannot be said to have been a surprise to the appellants, Webb v. United States, 10 Cir., 191 F.2d 512; and the evidence was important to the prosecution to show the intent and motive of Turner, Harris v. United States, 6 Cir., 13 F.2d 849; Roper v. United States, 10 Cir., 54 F.2d 845.

Affirmed.

RITTER, District Judge, dissents.