UNITED STATES of America, Plaintiff-Appellee,

v.

William Judson SHIMA, Defendant-Appellant.

No. 76–1778.

United States Court of Appeals, Fifth Circuit.

Jan. 24, 1977.

Tom S. McCorkle, Jr., Dallas, Tex. (Court-appointed), for defendant-appellant.

Michael P. Carnes, U. S. Atty., John W. Sweeney, Jr., Asst. U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

COLEMAN, Circuit Judge.

The grand jury indicted the appellant as follows:

"On or about September 17, 1975, at Dallas, Texas, in the Dallas Division of the Northern District of Texas, WILLIAM JUDSON SHIMA, defendant, knowingly and intentionally did possess with the intent to distribute approximately 7113.1 grams of a plant material containing lysergic acid amide, a Schedule III controlled substance.

"A violation of Title 21, United States Code, Section 841(a)(1)."

Shima was caught with the goods in Apartment 216, 2707 Shelby, Dallas, Texas. He stood a Bench trial, was found guilty (as was obviously the case), and was sentenced to time spent in jail awaiting trial, plus probation and parole requirements.

He now appeals, asserting that his apprehension was accomplished by a search which violated his Fourth Amendment rights.

We affirm.

DEA Agent B. F. Bailey first purchased about an ounce of the controlled substance from one Chester Leonard. Later, about 5:30 P.M., September 17, 1975, Bailey spoke with Leonard by telephone and Leonard agreed that he would deliver ten pounds of the controlled substance, for which he was to be paid $6,000. Leonard stated that the people "behind him" would not allow him to bring all of the fifteen kilograms then available, for which Bailey was to pay $19,-000. Instead, he would be permitted to bring the remainder "if everything transpired as planned" in connection with the ten pound sale.

When Leonard delivered the ten pounds, he was arrested on the spot. Seeing that he had both feet deeply in the bear trap, Leonard offered to cooperate with the agents. He promised to take them to the apartment where, he said, the remainder of the contraband was in the keeping of two white men, waiting there for his prompt return with the expected $6,000.

Officer Bailey testified that he and the other law enforcement agents went to the apartment "to acquire or seize the additional amount of the lysergic acid amide, if it was there, and also arrest the defendants if they were in possession of it".

Leonard, Bailey, and four other law enforcement agents arrived at the apartment complex at 2707 Shelby, parked on the street, and walked down a public walkway to the apartment complex. While approaching the apartments, Leonard pointed out the suspects' apartment, indicating that it was a corner one, upstairs. The other agents remained "around the corner away from the front door" while Leonard and Bailey walked to the front door of the apartment.

Access to this door was over a common walkway, in use for access to about ten apartments on that floor.

Continued knocking on the door produced no answer, so Agent Bailey directed Agent Combs to get a passkey from the apartment manager. While waiting for the passkey, Leonard and Bailey looked into the front window of the apartment and observed on several pieces of furniture what appeared to be powder of the kind previously sold to the agents.

When Agent Combs returned with the passkey, Agent Bailey and the others knocked again and identified themselves. Receiving no response, they unlocked the door and went immediately to the back bedroom where they found William Shima and another man. Both were arrested. On the way to the bedroom they observed portions of the illegal substance scattered in various places within the apartment. In the bedroom itself they found about six pounds of the prohibited material.

■ It must be recognized at the outset that only in "a few specifically established and well-delineated" situations may a dwelling be searched without a warrant, even if there is probable cause to conduct it, and the burden is on the government to show that the exception existed, *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1969). Among the recognized exceptions are (1) official response to an emergency, or (2) the goods ultimately seized were in the process of destruction, or (3) it was impracticable to obtain a warrant, *Id.* at 35, 90 S.Ct. 1969. Imminent destruction, removal, or concealment of the property intended to be seized, or the likelihood of it taking place before a warrant can be obtained, may provide an exception, *United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

■ Standing alone, the use of a passkey to obtain entry for the warrantless search of a dwelling is not permitted, *United States v. Jeffers, supra.*

In the instant case the officers had no search warrant, Chester Leonard was not an informant with a prior record of reliability.

■ Nevertheless, we are of the opinion that the entry into the apartment and the subsequent search, *as ultimately accomplished,* did not infringe Fourth Amendment rights.

In the first place, the officers were not relying solely on information provided by Leonard. There were underlying circumstances of a corroborative nature. He had previously agreed to appear with a certain amount of acid, explaining at that time his inability to bring a larger amount. He did appear, with the promised amount. He timely supplied further information as to where the remainder of the substance could be found and who was in possession of it, although that information could only put him more deeply in the mire and was against his penal interest, *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The officers could reasonably expect that any delay in Leonard's expected return, which he said was to occur within fifteen or twenty minutes, would alert the confederates that "everything had not transpired as planned". The United States Attorney's office was closed at day's end and a magistrate would have to be summoned to pass on the issuance of a warrant, which would have consumed a con-

siderable length of time, some two or three hours. The officers were lawfully on the walkway which was open and available to the general public, *McDonald v. United States, supra,* (opinion of Mr. Justice Jackson). From that vantage point they saw powder scattered around in the apartment which appeared to be like that they had just bought from Leonard. What a person knowingly exposes to public view, whether in home or office, is not a subject of Fourth Amendment protection, *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

We need not decide whether a warrantless search prior to seeing the powder in the apartment would have passed Fourth Amendment muster, for that is not what happened.

The passkey did not arrive until after the powder had been seen, a sight which further corroborated Leonard's prior information. Anyone in the apartment had already been warned of the officers' presence by the knocking on the door. The powder was susceptible to speedy disposition via the plumbing.

In this posture of affairs, this case squares with our case, *Gil v. Beto,* 5 Cir., 1971, 440 F.2d 666. There, officers, in a place where they had a right to be, possessing no search warrant, looked through a motel room window and saw Gil in possession of narcotics paraphernalia. They broke into the motel room and arrested Gil. Relying on *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), we denied Fourth Amendment relief.

The only difference between *Gil* and this case is that the officers did not see Shima when they looked in the window. But they did see the powder. That, like the narcotics paraphernalia, was *the point.*

The judgment of the District Court is AFFIRMED.