**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Earnest JACKSON, Jr., and James
Arthur Porter, III,
Defendants-Appellants.**

No. 77–5707.

United States Court of Appeals,
Fifth Circuit.

Feb. 2, 1979.

Rehearing and Rehearing En Banc
Denied March 7, 1979.

Earnest Jackson, Jr., pro se.

James R. Willis, Cleveland, Ohio, for Jackson.

James Arthur Porter, pro se.

Dennis E. Siegel, Murray Silver, Atlanta, Ga., for Porter.

J. R. Brooks, U.S. Atty., Bill L. Barnett, Asst. U.S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before MORGAN, RONEY and VANCE, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Following a jury trial in the United States District Court for the Northern District of Alabama, appellants Earnest Jackson, Jr., and James Arthur Porter, III, were convicted under a two-count indictment of violating the federal narcotics laws. Count One charged appellants with conspiracy to distribute approximately 934.5 grams of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846. Count Two charged appellants with possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1).[1] In their principal argument appellants contend that their Fourth Amendment privacy rights were violated when narcotics agents rented an adjacent motel room and eavesdropped on conversations in Jackson's room by placing their ears next to the space at the bottom of the door connecting the two rooms. Both appellants also alleged that none of the evidence admitted at trial established their possession of the heroin. Jackson further asserts a number of additional errors requiring reversal which we describe and discuss below. We affirm as to appellants' conspiracy conviction but reverse as to their conviction for possession with intent to distribute.

## I. FACTS

For several years prior to Jackson's arrest, agents of the Drug Enforcement Administration had suspected him of narcotics laws violations. Despite their suspicions and a three-year investigation involving periodic surveillance of his conduct and activi-

---

[1] Appellants received twelve year sentences with a special parole period of fifteen years under Count One and fifteen year sentences with a special parole period of fifteen years under Count Two. Jackson was fined $15,000 on Count One and $25,000 on Count Two; Porter was fined $10,000 on both counts. Appellants' sentences under the two counts run consecutively.

ties, DEA agents had never observed Jackson passing heroin nor uncovered any hard evidence that he was trafficking in narcotics. On July 4, 1977, Jackson and a Miss Beverly Pertilla checked into room 312 of the Kahler Plaza Hotel in Birmingham, Alabama. An off-duty Birmingham police officer working security at the hotel spotted Jackson on July 5 and notified the DEA of his presence. On July 6 Agent Hahn of the DEA and Sergeant Trucks of the Birmingham Police Department rented room 314 at the hotel for the purpose of monitoring Jackson's activities.[2] Rooms 312 and 314 adjoin and are connected by a set of double doors. After entering room 314 the officers determined that they could hear conversations in room 312 by lying on the motel room floor and pressing their ears to the ¾″ crack at the bottom of their connecting door.[3] Although at times their aural surveillance was impeded by the sounds of the television, plumbing, and air conditioning in room 312, the officers had no difficulty in overhearing much of the conversation in the adjoining room. At no time did the officers use any electronic or mechanical device to assist them in their aural surveillance.

Utilizing this eavesdropping technique, the officers on July 6 overheard Jackson make two telephone calls to Buffalo, New York. During these calls Jackson stated, "No, I haven't been able to contact my man yet. [*Pause.*] It is like gold." and "The stuff is coming from L.A. [*Pause.*] No problem with my man." On the morning of July 7 Jackson told his room guest, Beverly Pertilla, to call an airline and make flight reservations to Buffalo, New York. Sgt. Trucks immediately dispatched two undercover officers to the airport to set up surveillance. Shortly after Pertilla made the reservations, Jackson received a brief telephone call. He then cursed, seemed excited for several minutes, and told Pertilla that "the stuff may be in trouble" and "the stuff is worth $40,000." Within twenty minutes Jackson received another telephone call in which he stated, "is the stuff all right? Is the suitcase still at the airport?" Following this conversation Jackson told Pertilla, "I don't know what went wrong. The police followed him to the airport. The suitcase is still at the airport. The flight came in at 9:08 and I don't know what went wrong."

Upon arriving at the airport, the undercover officers parked their unmarked car behind a car driven by appellant Porter. Porter immediately drove away from the terminal building, passed back through the area three minutes later, disappeared for approximately fifteen minutes, and finally departed the airport with Linda Johnson who had arrived at 9:08 a. m. on a flight from Los Angeles, California.[4] Miss John-

2. Sgt. Trucks testified that the officers did not rent the adjacent motel room for the express purpose of listening to Jackson's conversations and that prior to entering room 314 they had no idea that they could overhear what was said in room 312. The outcome of this case would not be affected even had officers anticipated eavesdropping on Jackson's conversations.

3. In order to avoid detection, the officers did not open the connecting door in their room so that they might better hear what was said in the adjoining room.

4. Miss Johnson testified that she was unaware that the canvas bag she transported from Los Angeles to Birmingham contained heroin, and the prosecutor stated in court that the government considered her to be an innocent participant in the criminal scheme. She testified that she met Porter in Los Angeles in June 1977 and that he invited her to his family reunion in Birmingham. On July 6 a woman Miss John-

son did not know came by her apartment and gave her $130 as air fare to Birmingham. She also handed her a small canvas bag and requested that she pack it with the things she was carrying on her trip. The stranger told Miss Johnson that Porter would pick her up at the Birmingham airport. Appellants contend that the witness' testimony as to what the unidentified woman said when she brought the money and canvas bag to the witness at her Los Angeles apartment violated the hearsay rule and the Confrontation Clause of the Sixth Amendment. We disagree. The Federal Rules of Evidence exclude from the operation of the hearsay rule any oral statement not intended as an assertion. F.Rule Evid. 801(a). Furthermore, an out-of-court statement that is not offered as proof of the matter asserted therein is not hearsay. F.Rule Evid. 801(c). We think that the out-of-court statements fall within that class of " 'cases in which the utterance is contemporaneous with a nonverbal act, indepen-

son did not pick up her luggage before leaving with Porter. Porter drove Linda Johnson to the Kahler Plaza Hotel, escorted her to her room, and then paid a visit to room 312. Jackson asked Porter, "Is everything all right? Is the suitcase still at the airport? Good, let's go."

By the time Jackson and Porter arrived at the airport, Linda Johnson's unclaimed suitcase had been placed in the Delta Airlines baggage claims office. The suitcase, which was the only piece of unclaimed luggage, was sitting near a window where it was clearly visible to passersby. Jackson walked around inside the terminal and, at one point, paused in front of the baggage claims office. Porter, who was carrying a piece of luggage, entered the baggage claims office, looked for a moment in the direction of the unclaimed suitcase, and left the office. He then walked to a United Airlines desk where he purchased a ticket and checked his luggage. Jackson and Porter left the terminal, got into a car, and were arrested as they attempted to leave the airport.

Based on the information obtained as a result of the eavesdropping, DEA agents obtained search warrants on both the Johnson suitcase and room 312 at the hotel. Inside the suitcase was a zippered canvas bag which contained approximately two pounds of 8% heroin and approximately one pound of a substance used as a diluter. The heroin had a wholesale value of approximately $40,000 and a street value approaching $1,000,000. The search of room 312 at the hotel revealed a tote bag which contained $42,000 in forty-two $1,000 bundles.

## II. FOURTH AMENDMENT CONSIDERATIONS[5]

The Fourth Amendment prohibits "unreasonable searches and seizures" and assures "the right of the people to be secure in their persons, houses, papers, and effects." The protections afforded by this amendment provide individuals with a right of privacy which must not be arbitrarily invaded by either the federal government or the states. *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). This court has repeatedly stressed the concept that "the underlying purpose of the Fourth Amendment is to protect and shield citizens from unwarranted intrusions into their private domain." *United States v. Davis,* 423 F.2d 974, 977 (5th Cir. 1970). *See Texas v. Gonzales,* 388 F.2d 145 (5th Cir. 1968). Any evidence secured through an illegal search and seizure may not be used in a federal prosecution, *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), nor may the fruit of such tainted evidence be admitted against the defendant whose privacy rights were originally violated. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Cruz,* 581 F.2d 535 (5th Cir. 1978).

The scope of the Fourth Amendment's protection of personal privacy is delineated in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). See *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (No. 77–5781). In *Katz* the Supreme Court held that eavesdropping on conversations in a telephone booth by means of an electronic listening device attached to the top of the booth constitutes a

---

dently admissible, relating to that act and throwing some light upon it.'" *United States v. Annunziato,* 293 F.2d 373, 377 (2d Cir. 1961) (quoting Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229, 236 (1922)). Since the unidentified woman in Los Angeles was not a witness against the appellants, there was no Confrontation Clause violation in this case.

**5.** Since we find no Fourth Amendment violation in this case, we need not address the ques-

tion of Porter's "standing" to challenge the legality of the agents' surveillance of conversations between Jackson and Beverly Pertilla. We note, however, that the Supreme Court in the recent case *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), disapproved of the use of "standing" analysis in the Fourth Amendment context and favored an approach that focuses on a particular defendant's rights under substantive Fourth Amendment law.

Fourth Amendment search and seizure.[6] In finding an illegal search despite the absence of a physical intrusion into the phone booth, the Court rejected the trespass doctrine applied in previous cases and held that an individual is entitled to Fourth Amendment protection whenever he has a "reasonable expectation of privacy."[7] The Court stated that the parties' disagreement over whether a telephone booth is a constitutionally protected area

> deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

389 U.S. at 351–52, 88 S.Ct. at 511 (citations omitted). We must decide if the agents' aural surveillance of Jackson's room amounted to an illegal search under the principles enunciated in *Katz*.

This court has had previous occasion to address the constitutional issues presented on the facts of this appeal. In *Jones v.* *United States*, 339 F.2d 419 (5th Cir. 1964), narcotics agents entered a motel room adjoining appellants' room and removed a control panel from a heating unit built into the common wall dividing the two rooms. With the panel removed the agents were able to see and hear incriminating activity in appellants' room. The court concluded that in the absence of a physical intrusion into the premises occupied by appellants, the agents' surveillance did not amount to a search and seizure in violation of the Fourth Amendment. Because *Jones* applied the trespass analysis rejected in *Katz* and did not approach the issue in terms of the reasonableness of appellants' expectation of privacy, that decision has no precedential value for this court.

▮ Employing the privacy interest analysis approved in *Katz*, we hold that these appellants had no justifiable expectations of privacy with respect to their motel room conversations which were audible to the unaided ears of the government agents lawfully occupying an adjoining room. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are

---

**6.** *Katz* was not the first case to hold that conversations can be the object of a Fourth Amendment "search and seizure." *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).

**7.** Although *Katz* is generally understood as enunciating a "reasonable expectation of privacy" standard, this language is actually taken from Justice Harlan's concurring opinion. 389 U.S. at 360, 88 S.Ct. 507. He explained this standard as follows: "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " 389 U.S. at 361, 88 S.Ct. at 516. The majority employed similar language when it held that the government's eavesdropping activities "violated the privacy upon which [petitioner] justifiably relied . . . ." 389 U.S. at 353, 88 S.Ct. at 512. The Court in *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), also speaks in terms of a "justifiable expectation of privacy." In its most recent pronouncement, the Court interprets *Katz* as articulating a "legitimate expec-

tation of privacy" standard. *Rakas v. Illinois, supra,* —— U.S. at ——, 99 S.Ct. at 430. In a footnote the Court provides some guidance as to the meaning of "legitimate":

> "[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.' His presence, in the words of [*Jones v. United States*, 362 U.S. 257, 267, [80 S.Ct. 725, 4 L.Ed.2d 697] (1960)], is 'wrongful'; his expectation is not 'one that society is prepared to recognize as "reasonable." ' *Katz v. United States*, 389 U.S. 347, 361, [88 S.Ct. 507, 19 L.Ed.2d 576] (Harlan, J., concurring)."

*Rakas v. Illinois, supra,* —— U.S. at —— n.12, 99 S.Ct. at 430 n.12.

Whenever we use the phrase "reasonable expectation of privacy" in this opinion, we mean to incorporate the concepts of "justifiability" and "legitimacy." *See generally Note*, 76 Mich. L.Rev. 154, 168 n.64 (1977).

subject to seizure and may be introduced into evidence." *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (per curiam). The plain view doctrine defines certain sensory observations as being outside the scope of the Fourth Amendment's protections. This doctrine is entirely consistent with the *Katz* expectations standard since an individual can have no justifiable expectation of privacy as to activities he exposes to the plain view of others. *Katz, supra* at 351, 88 S.Ct. 507.[8] We think that conversations in a motel room which are audible to one in an adjoining room constitute words exposed to the "plain view" of others.

In assessing the reasonableness of appellants' privacy expectations, we are mindful that the concept of the sanctity and inviolability of the home stands at the very core of the protections afforded by the Fourth Amendment. *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Fixel v. Wainwright,* 492 F.2d 480 (5th Cir. 1974); *United States v. Davis,* 423 F.2d 974, 977 (5th Cir. 1970).[9] We also recognize that "[a] hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office." *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Lanza v. New York,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962). But despite the fact that an individuals' Fourth Amendment rights do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish. For although a motel room shares many of the attributes of privacy of a home, it also possesses many features which distinguish it from a private residence:

> A private home is quite different from a place of business or a motel cabin. A home owner or tenant has the exclusive enjoyment of his home, his garage, his barn or other buildings, and also the area under his home. But a transient occupant of a motel must share corridors, sidewalks, yards, and trees with the other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home.

*Marullo v. United States,* 328 F.2d 361, 363 (5th Cir. 1964). No matter where an individual is, whether in his home, a motel room, or a public park, he is entitled to a "reasonable" expectation of privacy. *Katz, supra,* 389 U.S. at 359, 88 S.Ct. 507; *United States v. Holmes, supra,* 521 F.2d at 864. However, what is reasonable in one setting may be unreasonable in another, and assessing the reasonableness of an individual's privacy expectations in terms of "place" does not offend the standard articulated in *Katz.* "As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' " *Katz, supra* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). In view of the open, public, and shared atmosphere of a motel, the nearness of one's neighbors, and the prevalence of uninvited listeners in human society, we hold that a motel room occupant assumes the risk of an eavesdropper[10] when he carries on his conversations in a tone of voice audible to one outside the room.

**8.** "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." 389 U.S. at 351, 88 S.Ct. at 511.

**9.** "A person's home holds a favored position in the list of those areas which are protected from unreasonable searches and seizures." *United States v. Davis, supra* at 977.

**10.** "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we assume whenever we speak." *Hoffa v. United States,* 385 U.S. 293, 303, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), quoting *Lopez v. United States,* 373 U.S. 427, 465, 83 S.Ct. 1381, 1402, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting).

Our holding in this case is clearly supported by this court's decisions in *Gil v. Beto*, 440 F.2d 666 (5th Cir. 1971) and *United States v. Williams*, 581 F.2d 451 (5th Cir. 1978). In *Gil* police officers began their surveillance of appellant by obtaining permission to occupy a motel cabin adjoining appellant's cabin. One of the officers was able to see into the appellant's cabin by standing on a walkway alongside the cabin and peering through some partially opened venetian blinds. While maintaining a vigil at this window, he observed narcotics paraphernalia and drug-related activity. In response to appellant's argument that he was the victim of an unreasonable search, this court held that "[n]o Fourth Amendment rights are violated when police officers are lawfully on the premises and merely observe what is in plain view." *Id.* at 667. *See United States v. Shima*, 545 F.2d 1026 (5th Cir. 1977). We see no difference between engaging in nonelectronic aural surveillance of appellant's motel room and keeping a vigil at his window and maintaining visual surveillance of his activities. Neither act is genteel, but neither act is unconstitutional.[11]

In *Williams* federal agents, acting on a tip that a still was located on certain farm property, crept through a wooded area and across a clearing until they approached the outbuildings of the farmstead. From this position the agents detected the odor of moonshine liquor and, equipped with this information, procured a search warrant for the property. Applying the recognized distinction between open fields and curtilage as a useful gauge in measuring the reasonableness of appellant's privacy expectations,

this court held that the agents' furtive trespass did not constitute a Fourth Amendment violation.[12] We think that this case is consistent with the result we reach today.

 We emphasize that a government agent may legally engage in aural surveillance only when he listens from a place where he has a legal right to be. *See Harris v. United States, supra.* Although this court has abandoned the use of property concepts to define the scope of the Fourth Amendment, we have not hesitated to find an illegal search where the government agent trespasses in order to secure his plain view. *United States v. Davis*, 423 F.2d 974 (5th Cir. 1970); *Texas v. Gonzales*, 388 F.2d 145 (5th Cir. 1968); *Brock v. United States*, 223 F.2d 681 (5th Cir. 1961). Whenever government agents enter into the curtilage they necessarily intrude upon the individual's reasonable expectation of privacy. *United States v. Williams*, 581 F.2d 451 (5th Cir. 1978). These cases suggest that property concepts, though no longer a Fourth Amendment yardstick, do retain some vitality under the *Katz* analysis. *See Rakas v. Illinois, supra* —— U.S. at —— n.12, 99 S.Ct. 430 n.12; Note, 76 Mich. L.Rev. 154, 171–75 (1977). We reiterate, however, that privacy remains the proper focus and that under a privacy analysis there is no requirement that the government engage in a physical trespass before the individual can invoke Fourth Amendment protection. Thus, the fact that the agents in this case were lawful occupants of the motel room from which they listened and did not physically trespass into appellants' room, though significant, is not con-

11. "Not every breach of etiquette poses a constitutional issue." *United States v. Sedillo*, 496 F.2d 151, 152 (9th Cir. 1974). *See United States v. Williams*, 581 F.2d 451, 454 (5th Cir. 1978); *United States v. Fisch*, 474 F.2d 1071, 1077 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973); *Anspach v. United States*, 305 F.2d 48 (10th Cir.), *cert. denied* 371 U.S. 826, 83 S.Ct. 46, 9 L.Ed.2d 65 (1962).

12. We do not read *Williams* as requiring a perfunctory application of the open fields—cur-

tilage distinction. Rather, we think that the place from which the agents receive their sensory impressions is merely a factor to be considered in evaluating the reasonableness of privacy expectations. *See United States ex rel. Gedko v. Heer*, 406 F.Supp. 609 (W.D.Wis. 1975). *Williams* does not foreclose the possibility that this court may, under different facts, find a Fourth Amendment violation even though the government agents make their observations from an "open field."

trolling.[13] We conclude that the location of the government surveillant vis-a-vis the individual surveilled is merely a factor to be considered in assessing the justifiability of the individual's privacy expectations. On these facts, however, we find that the appellants assumed the risk of being overheard by an eavesdropper and therefore had no justifiable expectation of privacy as to their criminal conversations.

■ Our holding today is also consistent with cases decided by other circuits on virtually the same facts. In *United States v. Fisch*, 474 F.2d 1071 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973), as in this case, police officers rented a room in the motel where appellants were staying and surreptitiously listened to appellants' conversations by placing their ears next to a crack at the bottom of the door connecting the two rooms. Utilizing the *Katz* expectations standard, the Ninth Circuit concluded that appellants had not justifiably relied on the privacy of their conversations which, in essence, the court likened to items exposed to the "plain view" of others. We agree with the court's reasoning and with its conclusion that no illegal search occurred when the officers were forced to listen more closely by placing their ears next to the door:

> Appellants would have us divide the listening room into privileged or burdened areas, and the conversations into degrees of audibility to, we presume, the normal ear, thus a remark heard on the bed arguably admissible, but not those heard at the door, a loud remark admissible, arguably one uttered in "normal" tones, but definitely not one whispered. We find no precedent for a categorization involving such hair-splitting distinctions and we are not disposed to create one.

*United States v. Fisch, supra* at 1077.[14] In *United States v. Llanes*, 398 F.2d 880 (2nd Cir. 1968), the court refused to find a Fourth Amendment violation where a narcotics agent stationed himself in a hallway near an apartment door and eavesdropped on appellants' conversations inside the apartment. "We believe that conversations carried on in a tone of voice quite audible to a person standing outside the home are conversations knowingly exposed to the public." *Id.* at 884.[15] *See United States v. Ortega*, 471 F.2d 1350 (2nd Cir. 1972), *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973). These cases support our position that nonelectronic eavesdrop-

13. We note that under the *Katz* expectations test it would be possible for a police officer, using only his natural senses, to commit an illegal search and seizure without engaging in a physical trespass. *See United States v. Case*, 435 F.2d 766 (7th Cir. 1970). The Court in *Katz* did not restrict its holding that a nontrespassory surveillance could violate the Fourth Amendment to electronic eavesdropping cases. We therefore reject as overly broad the government's proposed rule that any information obtained by an officer using his natural senses from a place where he has a legal right to be is admissible evidence. Cases may arise in which a police officer, though legally in the place from whence he makes his observations, nevertheless infringes on the privacy upon which an individual justifiably relied.

14. Appellants' attempts to distinguish *Fisch* are unpersuasive. Jackson asserts that the court's conclusion that there was no justifiable reliance on privacy is bottomed on the fact that one critical conversation was audible to an officer while in the middle of his room. As the language quoted in text indicates, however, the *Fisch* court declined to "divide the listening room into privileged or burdened areas." *See*

*United States v. Martinez-Miramontes*, 494 F.2d 808, 810 (9th Cir. 1974). Porter distinguishes *Fisch* by pointing out that the officers in that case had a high degree of probable cause before they undertook the eavesdropping. However, if Porter is correct that this type of warrantless eavesdropping is a Fourth Amendment search, the fact that the officers in *Fisch* had a high degree of probable cause is immaterial. "Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause.'" *Katz, supra* 389 U.S. at 357; *United States v. Shima*, 545 F.2d 1026 (5th Cir. 1977).

15. Although the court's opinion does not detail the precise position from which the agent intercepted the conversations, he apparently had no need to put his ear to the apartment door as the occupants "were speaking so loudly that their voices were clearly audible in the hallway." *United States v. Llanes, supra* at 882. However, we do not think that placing an ear next to the door converts otherwise permissible surveillance into an illegal search.

ping from an adjoining motel room does not constitute a Fourth Amendment violation.

## III. CHARACTER EVIDENCE

 In a second argument Jackson contends that he should have been allowed to introduce testimony supporting his reputation for "truth and veracity." The trial court excluded this evidence on the ground that Jackson's reputation for truth and veracity was not pertinent to the crime with which he was charged. The rule regarding the admissibility of character evidence to prove conduct is stated in Rule 404(a)(1) of the Federal Rules of Evidence:

> Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> (1) Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same.

In asserting that "an accused can always prove the existence of the trait of veracity in his character as a method of supporting his credibility," Jackson assumes that a defendant's credibility is in issue in any criminal prosecution. However, not all criminal indictments impugn the defendant's truthfulness and veracity. Since evidence of the trait of truthfulness is not pertinent to the criminal charges of conspiracy to distribute heroin or possession of heroin, Rule 404 forbids its introduction as circumstantial evidence of innocence of those crimes.

 Furthermore, when Jackson elected to take the stand at his trial he did not automatically acquire the right to bolster his credibility. Where an accused takes the stand as a witness he places his credibility in issue as does any other witness. If the prosecution chooses to attack his credibility, he may then introduce evidence of his good character for truthfulness and veracity:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) *evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked* by opinion or reputation evidence or otherwise.

Fed.R.Evid. 608 (emphasis added). We find no evidence of an attack upon Jackson's character for truthfulness. During the cross-examination the government attorney questioned Jackson closely about his version of the facts and pointed out conflicts between that testimony and the testimony of other witnesses. However, "[t]he mere fact that a witness is contradicted by other evidence in the case does not constitute an attack upon his reputation for truth and veracity." *Kauz v. United States*, 188 F.2d 9, 10 (5th Cir. 1951). *See Homan v. United States*, 279 F.2d 767, 772 (8th Cir. 1960). The district court did not err in excluding the proffered evidence.

## IV. EVIDENCE OF MISCONDUCT NOT CHARGED IN THE INDICTMENT

 Jackson further contends that he was entitled to a mistrial when the government elicited testimony from a prosecution witness concerning appellant's use of cocaine, thus connecting him with criminal conduct outside the scope of the indictment.[16] It is generally improper to introduce evidence of misconduct not charged in the indictment. See *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed.

---

**16.** The following exchange took place during the government's questioning of Beverly Pertilla:

> Q What, if you recall, did Mr. Jackson bring with him, if anything, when he came back to the room?
> A A pizza pie and a Sprite.
> Q Anything else?
> A And I think he had a small amount of cocaine, but I am not positive that is what it was.

. . . . .

> Q When arrived back, what did you do? Had the pizza been opened?
> A No, we ate it. I had a small piece because I had eaten dinner already. And he ate the pizza.
> Q Are you sure it was a Sprite?
> A Well, I don't know whether I had any or not.
> Q You sure it was cocaine?
> A Perhaps.

168 (1948); *United States v. Beechum*, 555 F.2d 487, *vacated on other grounds*, 582 F.2d 898 (5th Cir. 1978). This general rule of exclusion is set forth in Fed.R.Evid. 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparations, plan, knowledge, identity, or absence of mistake or accident.

Since none of the recognized exceptions to the rule are applicable in this case, Rule 404(b) precluded the government from introducing evidence of appellant's other criminal acts to establish his propensity to commit the crimes charged in the indictment. When the witness mentioned appellant's possession of cocaine, the government attorney should have changed the subject and should not have asked her if she was "sure it was cocaine." We are of the opinion, however, that the appellant was not prejudiced by the witness' testimony. The record reveals that the properly admitted evidence against appellant as to the conspiracy charge was so overwhelming that the introduction of the inadmissible evidence was harmless beyond a reasonable doubt. *United States v. Warren*, 578 F.2d 1058, 1064 (5th Cir. 1978) (en banc); *United States v. Bokire*, 523 F.2d 767, 769 n.2 (5th Cir. 1975). "An error that might be prejudicial in a close case does not require reversal when evidence of the defendant's guilt is strong." *United States v. Roland*, 449 F.2d 1281 (5th Cir. 1971); *United States v. Lipscomb*, 435 F.2d 795 (5th Cir. 1970). The fact that curative instructions were not given to the jury to disregard the evidence does not require a mistrial. *United States v. Resnick*, 488 F.2d 1165 (5th Cir. 1974), *cert. denied*, 416 U.S. 991, 94 S.Ct. 2400, 40 L.Ed.2d 769 (1974).

### V. SUFFICIENCY OF THE EVIDENCE TO PROVE POSSESSION

Both Jackson and Porter challenge their convictions under Count Two of the indictment charging them with possession of heroin with intent to distribute. The government bears the burden of proving the elements of this offense beyond a reasonable doubt. In testing the sufficiency of the evidence [17] in this circumstantial evidence case, the trial judge was required to determine before submitting the case to the jury whether a reasonably minded jury must necessarily entertain a reasonable doubt as to appellant's guilt. *United States v. Haggins*, 545 F.2d 1009 (5th Cir. 1977). Examining the case in the light most favorable to the government, we agree with appellants that, as a matter of law, there was insufficient evidence of their guilt of the substantive offense to submit this charge to the jury.

The government introduced no evidence of appellants' actual possession of the heroin. Proof of actual possession is not necessary to sustain appellants' conviction, however, since constructive possession of a "controlled substance" violates 21 U.S.C. § 841(a). *United States v. Garza*, 531 F.2d 309 (5th Cir. 1976). Constructive possession need not be exclusive but may be shared by others, and such possession may be established by circumstantial as well as by direct evidence, *Garza v. United States*, 385 F.2d 899 (5th Cir. 1967), but neither presence in the area where the narcotic is discovered nor association with the person who does control the drug is sufficient to prove possession. *United States v. Stephenson*, 474 F.2d 1353 (5th Cir. 1973). To establish constructive possession the government had to prove appellants' dominion and control over the drug. *Garza v.*

---

**17.** Appellants also contend that the evidence was insufficient to support a conviction on the conspiracy count. Taking the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we hold that reasonable jurors could find the evidence inconsistent with every hypothesis of innocence. *United States v. Moore*, 505 F.2d 620, 623 (5th Cir. 1974), *cert. denied*, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975). The record reveals ample evidence to support appellants' conspiracy convictions.

*United States, supra; United States v. Mendoza*, 433 F.2d 891 (5th Cir. 1976). Acknowledging the ambiguity of the word "possession" and mindful that a charge of constructive possession should be viewed critically and approached with some caution, *United States v. Phillips*, 496 F.2d 1395, 1397 (5th Cir. 1974), *cert. denied*, 422 U.S. 1056, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975), we are unable to find any evidence in the record establishing appellants' dominion and control over the heroin. The conversations overheard by the narcotics agents suggested criminal activity and indicated that a conspiracy was afoot. Although several of these conversations made reference to an impending shipment from Los Angeles and to a suitcase at the airport, they are alone insufficient to prove appellants' possession of the contraband. The heroin was at all times located in Miss Johnson's unclaimed suitcase at the airport. Miss Johnson was not indicted as a coconspirator nor did the government suspect her of any wrongdoing. She testified that she never gave Porter the claim check for her luggage. Although appellants' perambulations at the airport took them very near the suitcase, at no point did either appellant attempt to claim the luggage from the airline officials. Moreover, when Porter and Jackson were arrested at the airport no claim check was found on either appellant, and, as one of the agents testified, without the claim check the airline baggage officials would not release the baggage. Considering all of the circumstances, we think that a reasonably minded jury could not have found that the evidence excluded every reasonable hypothesis of appellants' innocence of the crime of possession. Consequently, this part of the government's case should not have been submitted to the jury.

AFFIRMED in part and REVERSED in part.