STATE of Utah, Plaintiff and Respondent,

v.

Gregory ASHE, Molly Ann Glaser, and Kenneth Martin Cricks, Defendants and Appellants.

No. 19809.

Supreme Court of Utah.

Nov. 12, 1987.

**1256**

David L. Wilkinson, J. Stephen Mikita, Salt Lake City, for plaintiff and respondent.

G. Fred Metos, Salt Lake City, for defendants and appellants.

HALL, Chief Justice:

Following a nonjury trial, Gregory Ashe was convicted of knowingly and intentionally distributing a controlled substance and of possessing a controlled substance with intent to distribute the same in violation of Utah Code Ann. § 58–37–8 (Supp.1983) (amended 1985 & 1987). Ashe contends on appeal that since there were no exigent circumstances to justify the warrantless entry of his residence, evidence seized as a result thereof should have been suppressed.

### I

On March 14, 1983, codefendant Molly Glaser phoned Police Officer Brown, who was working as a narcotics agent on the Metro Narcotics Strike Force, and arranged to meet him at the Mount Aire Cafe in Park City, Utah, to complete a sale of four ounces of cocaine. After briefing surveillance officers about the transaction, Brown and several other officers left for Park City. Shortly after Brown arrived at the cafe, Glaser arrived with codefendant

Kenneth Cricks. Cricks parked the car, and Glaser entered the cafe, leaving Cricks behind. Once inside the cafe, Brown and Glaser began negotiating the particulars of the drug transaction. Initially, Glaser requested that Brown give her the entire purchase price of $8,400, promising that she would later return with all of the cocaine. The two eventually agreed that Brown would give Glaser $500 and that she would return with one of the four ounces for him to test. Then, if the cocaine was acceptable, they would complete the remainder of the sale.

After Brown gave Glaser the $500, she left the cafe and spoke to Cricks in the vehicle outside. Thereafter, she returned to the cafe and instructed Brown to wait five minutes after she left and then to meet her in a nearby parking lot.

In the meantime, while Glaser was meeting with Brown, Cricks, under police surveillance, drove twice to Ashe's house. On each occasion, Cricks exited Ashe's house after several minutes and returned to meet with Glaser at or near the cafe parking lot.

After her final meeting with Cricks, Glaser walked to Brown's car, whereupon she produced an envelope containing a white powdery substance. Brown performed a "wintergreen" test on the substance and determined that it was probably cocaine. He then began counting out the rest of the money, signaling surveillance officers to approach the car and assist in Glaser's arrest. Other officers arrested Cricks, who was parked out of sight nearby.

Prior to her arrest and during the time she was in Brown's car, Glaser voluntarily explained that her supplier was in the vicinity, that he expected the rest of the purchase money to be delivered "quickly," and that the final transaction for the remaining three ounces of cocaine was to take place at the door of her supplier's house in a "few minutes." Based upon this information, the officers decided moments after Glaser's arrest to "secure" Ashe's house and detain anyone inside it. The officers testified they became concerned that if the transaction did not take place almost immediately as planned, someone in Ashe's house would become suspicious and destroy evidence before the officers could obtain a warrant.

Thereafter, upon arriving at and approaching Ashe's residence, one of the officers observed Ashe look out of an upstairs window and then move away. After knocking, identifying himself as a police officer, and briefly waiting for a response, Brown kicked open the front door. As several officers entered, they heard a toilet flush. Brown then kicked open the bathroom door and discovered Ashe, completely dressed and standing away from the toilet. He also noticed two bags containing a white residue in the nearby wastebasket. After taking Ashe into custody, the officers performed a cursory security search of the premises. During this search, some of the evidence later introduced at trial was in plain view. Several of the officers then remained at Ashe's house while Brown and the Park City Police Chief left to obtain a search warrant.[1] When they returned, the officers conducted a thorough search of the house. All the evidence viewed and discovered, both before and after receipt of the search warrant, was seized and later admitted at trial.

Ashe contended that since exigent circumstances for the warrantless entry did not exist, he was entitled to a new trial and suppression of the evidence which was in plain view.[2] The trial court denied Ashe's motion to suppress, and we affirm.

---

1. While we do not reach the issue of an independently valid search warrant, we note that the affidavit in support of the search warrant did not detail any facts observed upon entry into Ashe's house. Instead, the information known to the officers prior to the entry was set forth in the affidavit, and this information demonstrated the existence of probable cause that additional cocaine would be found on the premises. Accordingly, a search warrant was issued—the validity of which is uncontested on appeal. *See United States v. Spanier,* 597 F.2d 139, 149 (9th Cir.1977).

2. Ashe advances only an analysis of the protections granted under the fourth amendment to the federal constitution. Therefore, we reserve for another day analysis of the Utah Constitution's prohibition against unreasonable searches and seizures.

## II

■ When faced with a motion to suppress, the trial court must determine whether proffered evidence is constitutionally defective.[3] In making this determination, the court is often required to resolve preliminary factual disputes.[4] Because of the trial court's position of advantage to observe witnesses' demeanor and other factors bearing on credibility, we will not disturb its factual assessment underlying a decision to grant or deny a suppression motion unless it clearly appears that the lower court was in error.[5] In applying this test to the case before us, the trial court's assessment is not against the clear weight of the evidence and we are not left with a "definite and firm conviction that a mistake has been committed."[6]

We begin our analysis with the understanding that searches conducted without a warrant "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."[7] The exceptions are " 'jealously and carefully drawn,' and there must be a 'showing by those who seek exemption ... that the exigencies of the situation made [the search] imperative.' "[8] Generally, exigency does not evolve from one individual fact. Instead, there is often a mosaic of evidence, no single part of which is itself sufficient. Our task is to review the totality of the facts and circumstances of the particular case to determine if the finding of exigency was proper.[9] Under the facts of this case, it is clear that exigency existed sufficient to meet the appellate test.

■ Numerous cases have sustained warrantless entries where the circumstances indicated that evidence might be destroyed or removed if entry was delayed until a warrant could be obtained.[10] In the instant case, evidence of the urgent need to secure Ashe's house to prevent escape and possible destruction of contraband is clearly manifest. Glaser had delivered an ounce

---

3. *See State v. Bullock,* 699 P.2d 753, 755 (Utah 1985).

4. *Id.*

5. *State v. Branch,* 743 P.2d 1187, 1189 (Utah 1987); *State v. Gallegos,* 712 P.2d 207, 208–09 (Utah 1985); *State v. Cole,* 674 P.2d 119, 123 (Utah 1983); *see also Davis v. United States,* 328 U.S. 582, 593, 66 S.Ct. 1256, 1261 90 L.Ed. 1453 (1946); *United States v. Gardner,* 627 F.2d 906, 909 (9th Cir.1980). In *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), the Supreme Court provided guidance for application of the clearly erroneous standard:

> The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under rule 52(a) is not whether it would have made the findings the trial court did, but whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed."

(Citations omitted); *see also State v. Walker,* 743 P.2d 191, 193 (Utah 1987).

6. *See* 395 U.S. at 123, 89 S.Ct. at 1576.

7. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted; emphasis in original).

8. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (plurality opinion) (footnote omitted) (quoting *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 514 (1958); *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948)).

9. *See Zenith Radio Corp.,* 395 U.S. at 123, 89 S.Ct. at 1576; *United States v. Glasby,* 576 F.2d 734, 737 (7th Cir.), *cert. denied,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 159 (1978); *see also State v. Nielsen,* 727 P.2d 188, 192 (Utah 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1565, 94 L.Ed.2d 758 (1987).

10. *See, e.g., United States v. Manfredi,* 722 F.2d 519, 522–23 (9th Cir.1983); *United States v. Cuaron,* 700 F.2d 582, 586–90 (10th Cir.1983); *United States v. Kunkler,* 679 F.2d 187, 191–92 (9th Cir.1982); *United States v. Erb,* 596 F.2d 412, 417–18 (10th Cir.), *cert. denied,* 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979); *United States v. Gardner,* 553 F.2d 946, 948 (5th Cir. 1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 34 L.Ed.2d 753 (1978); *United States v. Shima,* 545 F.2d 1026, 1028–29 (5th Cir.), *aff'd on rehearing,* 560 F.2d 1287 (per curiam; en banc), *cert. denied,* 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed. 2d 490 (1977); *United States v. Delguyd,* 542 F.2d 346, 350–52 (6th Cir.1976); *United States v. Blake,* 484 F.2d 50, 54–56 (8th Cir.1973), *cert. denied,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974).

of cocaine to Brown and together with Cricks was expected to receive and immediately return $7,900 to their source. This would be followed by the exchange of the remaining three ounces of cocaine. The police had maintained surveillance on Glaser and Cricks and had probable cause to believe that they were middlemen, that at least Glaser's compensation was to be cocaine, and that the money for the purchase of the cocaine was to be paid to someone else. The delivery point and Ashe's house were only two to five minutes apart. The details of the next exchange had already been discussed. Glaser voluntarily explained that her supplier was in the vicinity, that the "money was expected back within just a few minutes," and that the final transaction was to take place "at the door" of his house in a "few minutes." There was no reason to anticipate delay. Upon hearing Glaser's volunteered information, the officers could reasonably believe that at least the remaining three ounces of contraband were at the source's residence and that Glaser and Cricks would be expected to return there promptly with the money. Their failure to quickly return could be expected to alarm the waiting participant(s). In turn, this alarm would likely lead to the speedy removal or destruction of contraband, as well as escape or retaliation against the officers.[11] Therefore, once the officers took Cricks and Glaser into custody, they faced the serious risk that the source (Ashe) would escape or destroy contraband during the time needed to obtain a warrant. The conspirators' failure to return in the length of time necessary to complete the transaction might have tipped Ashe that Glaser and Cricks had been arrested and that his own arrest was imminent.[12]

The urgency of the situation escalated with the subsequent events at Ashe's residence. Upon arriving at and approaching Ashe's house, one of the officers observed Ashe look out of an upstairs window and then move away. Given the situation, the officers could logically and reasonably conclude that an interested party was inside the house and was aware that police were surrounding and approaching the residence.[13] These facts, taken as a whole, gave the officers probable cause to believe that Ashe had participated in the sale of cocaine and was present in the house. This information also constituted probable cause to arrest Ashe. Accordingly, exigent circumstances existed to enter the residence and make the arrest.[14]

This conclusion is supported by the fact that shortly before arresting Glaser, the officers had no advance information as to where the final sale of cocaine would occur. Indeed, the plan to arrest Glaser had only been made that morning. At that time, the officers, aware of neither Ashe's existence nor his location, were certainly not in a position to secure a warrant. They discovered these critical facts unexpectedly at about the same time Ashe from all appearances became aware of the officers' presence.[15]

---

11. *See Manfredi,* 722 F.2d at 522, 523.

12. *See United States v. Altman,* 797 F.2d 514, 515 (7th Cir.1986); *United States v. Moore,* 790 F.2d 13, 16 (1st Cir.1986); *United States v. Wulferdinger,* 782 F.2d 1473, 1476 (9th Cir.1986); *United States v. Hicks,* 752 F.2d 379, 384 (9th Cir.1985); *Kunkler,* 679 F.2d at 192; *United States v. Kulcsar,* 586 F.2d 1283, 1287 (8th Cir. 1978). In view of the exigency of the particular circumstances, there is no merit to Ashe's claim that the police acted improperly by not attempting to contact a justice of the peace prior to deciding to enter Ashe's residence.

13. *See Altman,* 797 F.2d at 515; *Wulferdinger,* 782 F.2d at 1476; *United States v. Acevedo,* 627 F.2d 68, 71 (7th Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980); *see also*

*Kulcsar,* 586 F.2d at 1285; *Glasby,* 576 F.2d at 738; *Gardner,* 553 F.2d at 948.

14. *See People v. Williams,* 200 Colo. 187, 191–92, 613 P.2d 879, 882 (1980) (en banc) (citing *United States v. Rubin,* 474 F.2d 262 (3d Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *People v. Barndt,* 199 Colo. 51, 604 P.2d 1173 (1980) (en banc); *People v. Boorem,* 184 Colo. 233, 519 P.2d 939 (1974) (en banc); *People v. Duleff,* 183 Colo. 213, 515 P.2d 1239 (1973) (en banc); *People v. Vaughns,* 175 Colo. 369, 489 P.2d 591 (1971) (en banc)).

15. *See Acevedo,* 627 F.2d at 71 n. 4. The potential discovery of the presence of police officers or agents has itself been said to constitute an exigent circumstance. *United States v. Curran,*

At that point, the officers' ability to have staged a siege at the house and waited for a search warrant would not have prevented the destruction of the evidence.[16] Moreover, even the officers' ability to merely protect against Ashe's escape was limited by their incomplete knowledge regarding Ashe's house. Despite their numbers, they could not be reasonably certain that their coverage of the apparent exits was sufficient to prevent Ashe's escape. Nor was there sufficient time to discover and secure any unknown exits that Ashe might have used to escape. Under these circumstances, the officers faced the choice, through no fault of their own, of acting immediately to enter and arrest Ashe without a warrant or risk not being in a position again to arrest him. Therefore, there was no realistic opportunity to seek a search warrant before the exigencies of the matter made it necessary to enter the dwelling.

Upon making the determination that immediate action was required, Brown knocked and waited for a response. Absent a response, the officers entered. As indicated, such entry was reasonable. Accordingly, in light of the above analysis, the arrest was lawful, and any items seized incident or pursuant to the warrantless entry were properly admitted.[17]

■ Shortly after they entered Ashe's residence, the sound of a flushing toilet alerted one of the officers that an individual on the premises might be destroying contraband. Investigation was therefore necessary in the interest of assuring the safety of the officers and preventing destruction of the contraband.[18] This investigation disclosed Ashe apparently attempting to flush the contents of a plastic bag down the toilet. The police action which led to this discovery was consistent with constitutional requirements.

The facts in the instant case are almost identical to those held sufficient to justify warrantless entries in *People v. Williams*[19] and *United States v. Delguyd*.[20] In *Williams*, police agents arranged a meeting with a drug middleman in the parking lot of a restaurant. The meeting was arranged to enable the agents to purchase one pound of cocaine. The middleman was to receive cocaine for arranging the transaction. After meeting, the agents followed middleman Salnajs and his driver, Sullivan, to a different location, whereupon Sullivan approached a specific house. While the agents were waiting there, defendant Williams arrived at the house, and he and Sullivan entered the residence. Thereafter, Sullivan returned to the agents' vehicle with a sample of the cocaine that was to be purchased. After the agents determined it was cocaine, both Sullivan and Salnajs reentered the residence. After more than forty-five minutes had passed since the agents arrived at Williams' house, Salnajs approached the agents' vehicle, gave them the cocaine, and indicated that one ounce had been removed as his payment for arranging the sale. The agents arrested Salnajs immediately, but at that time did not know the location of the ounce of cocaine that had been removed.[21] Nevertheless, they decided in conjunction with other surveillance police officers to " 'secure' the residence to prevent the possible destruction of evidence believed to be located there."[22] Thereafter, as the plainclothes police officers and agents approached the front of the house, an individual was seen looking out of a window next to the front door. As soon as the officers saw the parted drape fall back into place, they identified themselves as police officers and told the persons inside to open the door. Upon receiving no response, they kicked in the door. Once inside, one agent heard a toilet flush and,

498 F.2d 30, 35 (9th Cir.1974); *Williams,* 200 Colo. at 192, 613 P.2d at 882.

**16.** *See Spanier,* 597 F.2d at 140.

**17.** *See Acevedo,* 627 F.2d at 71.

**18.** *See Williams,* 200 Colo. at 192, 613 P.2d at 882; *Manfredi,* 722 F.2d at 522.

**19.** 200 Colo. 187, 613 P.2d 879.

**20.** 542 F.2d 346.

**21.** 200 Colo. at 189–90, 613 P.2d at 880–81.

**22.** *Id.* at 190, 613 P.2d at 881.

fearing that someone was destroying contraband, went to the bathroom and discovered defendant Jenkins "standing next to the toilet holding a plastic bag dripping with water." [23] After the individuals in the house were arrested, two officers remained in the house to "secure" it while a search warrant was sought. Approximately an hour and a half later, one of the agents returned with a warrant to search the house for cocaine. Numerous articles were seized during the search.[24]

Although the trial court found that there was no probable cause to justify issuance of the warrant and that there were no exigent circumstances to justify the forced entry into the house, the Colorado Supreme Court (sitting en banc) disagreed. In doing so, that court held in part that under the facts of that case, exigent circumstances existed for the officers to enter the residence and make the arrest. The court also held that the police officers did not have a realistic opportunity to seek a search warrant before "the exigencies of the matter made it necessary to enter the dwelling." [25]

Similarly, in *Delguyd,* defendant Delguyd fled while FBI agents were attempting to execute a search warrant at his home. When he arrived outside conspirator Maimone's apartment complex, he was confronted by other FBI agents who had been previously stationed there. Thereafter, one of the agents noticed Maimone watching from the living room window in his apartment; then Maimone disappeared into his apartment. Although the agents had prior information indicating that Maimone was Delguyd's confederate, and although they had previously surmised that Maimone may have evidence in his possession concerning the parties' joint loansharking activities, they did not have a warrant to arrest Maimone or enter his apartment. Nevertheless, the agents

rushed to the apartment and after identifying themselves and hearing a toilet being flushed, broke down the door. Maimone was in the process of tearing up papers and flushing them down the toilet. The agents retrieved some papers from the toilet, secured the apartment, and went to get a search warrant. With the warrant, they searched the apartment and seized evidence which helped to implicate Maimone and Delguyd in loan-sharking activities.

At trial, defendants moved to suppress the evidence seized from Maimone's apartment. The trial court granted this motion, suppressing the evidence as to both defendants on the grounds that there were neither exigent circumstances nor probable cause to justify the warrantless entry.[26] In reversing that order, the federal appellate court determined that the fact that the agents perceived Maimone observing the confrontation in the parking lot, together with the noises they heard upon demanding entrance at the door, supported the conclusion that evidence was probably being destroyed in the apartment. This conclusion, held the court, "not only contributes to the finding of probable cause to believe that evidence existed in the apartment, but also supplies the exigent circumstances necessary to justify a warrantless entry under the preservation-of-evidence rationale." [27]

While the Sixth Circuit Court of Appeals admitted that other (nonexigent) explanations could be proposed for these events, it held that "it is not necessary to eliminate all but one possible explanation in order to establish probable cause, so long as the explanation advanced by the ... agents to support the search appears in all probability to be correct." [28] The court also found that it was not necessary to show that Maimone was connected with the loansharking business in order to search his

---

**23.** *Id.*

**24.** *Id.*

**25.** *Id.* at 191–92, 613 P.2d at 882. The court further held that the circumstances surrounding discovery of the plastic bag (after the warrantless entry), the contents of which had apparently been flushed down the toilet, could be proper-

ly used in an affidavit to support an application for a warrant to search the entire premises for cocaine. *Id.* at 192–93, 613 P.2d at 883.

**26.** 542 F.2d at 349.

**27.** *Id.* at 351–52.

**28.** *Id.* at 351 (footnote omitted).

apartment. Rather, "[i]t was only necessary to show probable cause to believe that evidence of someone's loan sharking activities was present in Maimone's apartment." [29] Delguyd's desperate flight to Maimone's apartment established this probable cause. Similarly, in the case at bar, Glaser's comments, together with Cricks' activities, supported a finding of probable cause that evidence of drug activities was present in Ashe's house.

In the instant case, Ashe's appeal is predicated upon our acceptance of his version of what occurred and how the officers should have perceived the circumstances as they existed. However, there was contrary evidence on this point. Although Ashe finds significance in the fact that Glaser's testimony conflicted with that of Brown, the trial court did not find Glaser's testimony credible. In this regard, it is for the fact finder in the first instance to decide how much weight to give testimony.[30] To this end, the trial court viewed the State's witnesses (and their testimony that Ashe's conspirators were expected to return quickly) as justifying the officers' concern that participants waiting in the house would become alarmed and attempt to destroy the evidence and/or flee if Glaser and Cricks did not return quickly. Again, the trial court's findings on a motion to suppress are subject to a clearly erroneous standard of review, and its conclusions in the instant case are plainly supported by the record.[31]

■ In contrast to the above analysis, Ashe claims that the trial court erred in denying his motion to suppress because, first, the officers had decided to enter the house prior to leaving the scene where Cricks and Glaser were arrested and, second, Ashe's actions at the window were "caused by the presence of the officers at the house, a situation created by the officers themselves." In short, the contention is that in determining the existence of exigent circumstances, it was improper for the trial court to consider all the facts and circumstances which occurred up to and at the time the police entered the house. We disagree.

■ First, it is axiomatic that in determining whether a fourth amendment constitutional violation has occurred (thereby requiring suppression of evidence), the trial court may properly consider all admissible evidence supporting or contradicting the alleged misconduct. In this case, the alleged constitutional violation was the warrantless entry, not the mental decision to enter the home. Mere mental decision making (without action) by police officers does not violate a defendant's fourth amendment rights. As stated in *People v. Jansen,*[32] "The existence of probable cause and exigent circumstances must be determined by evaluating the facts available at the time of the warrantless entry and search." [33] The trial court evaluated such facts, and its judgment is supported by the record.

Second, the fact that the officers may have made an initial mental determination to enter the premises does not destroy circumstances as they occur. Having made such a decision, there is no evidence demonstrating that absent seeing Ashe at the

29. *Id.* at 352. The court in *Delguyd* also noted that inasmuch as the agents upon entry confined their activities to those necessary to preserve evidence, they had not abused the exigent circumstance search. The record clearly indicates that the scope of the officers' intrusion in the instant case was limited to acts necessary to maintain the status quo.

30. *See Walker,* 743 P.2d at 193; *State v. Bagley,* 681 P.2d 1242, 1244 (Utah 1984); *Cuaron,* 700 F.2d at 588 n. 5. While it does not affect the outcome of this appeal, we note that the police officers' explanations for failing to record the conversations between Brown and Glaser are inadequate at best.

31. *See Branch,* 743 P.2d at 1189; *Gallegos,* 712 P.2d at 208–09; *Cole,* 674 P.2d at 122.

32. 713 P.2d 907 (Colo.1986) (en banc).

33. *Id.* at 911 (emphasis added) (citing *United States v. Neet,* 504 F.Supp. 1220 (D.Colo.1981); *State v. Valenzuela,* 121 Ariz. 274, 589 P.2d 1306 (1979) (en banc)); *see also Erb,* 596 F.2d at 419 ("[W]e must look to the facts and circumstances existing in the instant case *at the time* the DEA agents *made the warrantless entry* and effected the arrests in order to determine whether probable cause and exigent circumstances justified that action." (Emphasis added.)).

window, the police would have in actuality entered without a warrant. Even if a "firm decision" to enter the premises had been made, there remains the possibility that if, upon arriving at Ashe's house, the circumstances had been such that a warrantless entry was unnecessary, the officers would not have entered without a warrant. However, once the officers became aware that Ashe knew of their presence and that someone in the house could destroy evidence, the circumstances allowed for a warrantless entry. It is thus inappropriate to ignore the impact of events which occurred prior to the time of the warrantless entry.

Third, in attempting to sever the various circumstances in order to isolate their individual insufficiency, the dissent relies solely upon a 1974 opinion in *United States v. Rosselli*.[34] *Rosselli* and its analysis, however, are inapposite to this case. Therein, the court determined that an unjustified warrantless search occurred when, without sufficient evidence of existing exigency, police agents intentionally alerted Rosselli of their presence and thereafter effected the warrantless entry.[35] At that time and under the circumstances of that case, there was no basis for the agents to believe and no evidence of exigency to sufficiently support a finding that prior to obtaining a warrant, Rosselli had any reason to flee or to destroy the contraband evidence.[36] Accordingly, when the agents knocked on Rosselli's door and intentionally informed him of their presence, "a conclusion that marijuana was being destroyed could not have been justified."[37]

*Rosselli* does not support the proposition that when police conduct creates the final exigent circumstance necessary to validate the warrantless search, police officers cannot thereafter rely on that circumstance to support their contention that the exigencies of the situation required a warrantless entry. Indeed, the court in *Rosselli* clearly stated that the emergency or exigent circumstance which did develop was not contrived or created by the agents. Moreover, a complete reading of *Rosselli* and its progeny unequivocally indicates that the court merely held that since no actual exigent circumstances existed or had occurred prior to the agents' knocking on Rosselli's door, and since therefore, absent only deliberate police action there was no basis for believing Rosselli had any reason to destroy the valuable contraband evidence, there was sufficient time for the agents to obtain a warrant, and the agents should not have created a situation to avoid the same.[38]

In contrast to *Williams* and *Delguyd*, discussed above, *Rosselli*, then, is inapposite to this case. Therein, the agents had plenty of time to obtain a warrant before they themselves created the only risk that evidence would be destroyed. In contrast, there are no allegations or evidence in the instant case to support a finding that the officers' own conduct created the exigent circumstances necessary to validate the warrantless entry and search. Instead, according to the trial court below, the police officers were confronted with a myriad of unavoidable exigent circumstances, including Glaser's statements, Cricks' trips to and from Ashe's house with the money and the cocaine, and Ashe's observations from the window. Also in contrast to *Rosselli*, the officers determined prior to arriving at Ashe's residence and knocking at his door that exigent circumstances mandated a warrantless entry. Their conduct did not create the "final exigent circumstance."

---

**34.** 506 F.2d 627 (7th Cir.1974).

**35.** *Id.* at 629–30. *Rosselli* involved only the remote and avoidable possibility that a girlfriend of Rosselli's brother could have notified Rosselli that some of his accomplices had been arrested. In this regard, the Seventh Circuit Court of Appeals noted that the girlfriend was at the apartment where the codefendants had been arrested and that any possible exigency could have been easily neutralized by leaving agents with the girlfriend until a warrant to search Rosselli's apartment was obtained. Moreover, since the codefendants were not expected back at Rosselli's residence, Rosselli would have no indication of their arrest or of his impending risk. *Id.; see also Altman,* 797 F.2d at 516.

**36.** *See* 506 F.2d at 629–30; 797 F.2d at 516.

**37.** 506 F.2d at 630.

**38.** *See id.* at 629–30; *see also* 797 F.2d at 516.

Instead, any conspicuousness on behalf of the officers approaching Ashe's house was a "reasonable protective response,"[39] and the officers did not rely solely upon seeing Ashe in the window to justify a warrantless entry.

Of further importance is the fact that the Seventh Circuit Court itself distinguished *Rosselli* from situations similar to the instant case where the likelihood of destruction of evidence was great and where police officers were not in a position to prevent the exigent circumstances that arose.[40] Indeed, in 1986 the court decided *United States v. Altman*,[41] which supports the trial court's decision herein. In *Altman*, codefendant Fagen and an undercover agent attempting to purchase ten pounds of hashish drove to defendant Altman's house. The agent gave Fagen money for the purchase of one pound of the contraband and agreed to purchase the remaining nine pounds if he found that the sample was satisfactory. Pursuant to this arrangement, Fagen entered and returned from Altman's house with the one pound of hashish, whereupon he was arrested. Since the agent believed that nine pounds of the remaining contraband were still in Altman's house, five surveillance agents surrounded the premises. After alerting Altman of their presence by knocking on the front door and identifying themselves as the police, one agent then saw Altman through the window "turn and walk to the rear of the house." The agents kicked in the door after one agent viewed Altman "dropping something into what appeared to be a crawl space in the closet."[42] Without regard to what the agents saw or the fact that they affirmatively alerted Altman of their presence, the Seventh Circuit held that two exigent circumstances provided the needed exception to the warrant requirement. Specifically, the court determined that the mere expectation and likelihood that Altman could have looked out of his window and could have been "tipped off by simply observing what was happening in front of his house ... alone might be enough to create the necessary exigent circumstances."[43] Moreover, since Altman expected Fagen to return almost immediately to the house with the remaining money to purchase the other nine pounds of hashish, his failure to return, "an event that would occur long before a warrant could possibly be secured," would result in the serious risk that Altman would realize that there had been some problem and the hashish would be destroyed. Therefore, even ignoring the fact that the agents saw Altman at the window, merely the likelihood of his observation and expectation made "it clear beyond all doubt that exigent circumstances were present."[44]

Importantly, when Altman himself attempted to argue the preclusive effect of *Rosselli* (i.e., the entry was unjustified since the agents created the exigency themselves by knocking on Altman's door and alerting him of their presence), the appellate court found any reliance thereon misplaced. Instead, the court distinguished *Rosselli* and stated:

In *Rosselli* the evidence of exigent circumstances consisted of the possibility that a girlfriend of the defendant's brother might have notified the defendant that some of his accomplices had been arrested. As this court pointed out, since the girlfriend was at the apartment where some of the other defendants were arrested, the police could have easily left some agents with the girlfriend until a warrant had been obtained. In *Rosselli*, there was simply *no other danger that the suspect would have been put on*

---

39. *Acevedo*, 627 F.2d at 71.

40. 506 F.2d at 629 n. 6.

41. 797 F.2d 514.

42. *Id.* at 514–15.

43. *Id.* at 515; *see also supra* note 15.

44. *See id.* The court also stated that once an undercover drug agent identifies himself to a drug dealer, the situation could become dangerous and the agent is not required by the fourth amendment to risk his life in order to prevent exigent circumstances from arising. *Id.* at 515–16.

*notice that it was in his penal interest to destroy evidence.*[45]

In the instant case, Ashe's argument would compel the trial court (as well as police officers) to ignore factually based evidence of exigent circumstances not deliberately created or avoidable by the officers and occurring prior to and at the time of the warrantless entry. As noted above, *Rosselli* and its progeny do not support that proposition, nor are we aware of any other supportive authority. Therefore, in light of the factual differences and viewing the evidence of exigent circumstances on a case-by-case basis,[46] *Rosselli* does not apply.

■ Ashe next contends that the trial court erred in not suppressing the evidence since there was no showing that absent the warrantless entry, evidence in his house would be destroyed. In this regard, Ashe implicitly claims that Glaser's statements to Brown do not support an objectively reasonable conclusion that someone in the residence would destroy the evidence before the officers could obtain a warrant. The State's failure to prove that Ashe may not have destroyed the evidence if Glaser did not return quickly does not compel this Court to disturb the trial court's finding based on adequate record evidence. Furthermore, such presumption is unsupported by case law, and many cases involving similar situations indicate otherwise.

For example, in *United States v. Kunkler*,[47] the Ninth Circuit Court of Appeals held that where it was reasonable for agents to infer that the defendant was a suspected drug supplier, that the defendant was wary and cautious in his dealings, that he was expecting his dealer to return shortly, and that the defendant's expectant conduct upon the dealer's delay indicated his suspicion that something had gone wrong, exigent circumstances justified a warrantless seizure of the defendant's premises.[48]

In the instant case, the evidence indicated that once the dealer (Glaser) was arrested, police officers suspected that Ashe's residence contained drugs, that the supplier (Ashe) was wary, that Glaser was expected back shortly, and that from his observations at the window, Ashe may have suspected that something had gone wrong. Accordingly, exigent circumstances justified a warrantless entry.

Similarly, in *Altman*, the Seventh Circuit Court of Appeals held that since Altman expected his dealer to return almost immediately to the house with the remaining money to purchase the hashish, when he failed to return (an event that would occur before a warrant could be secured), Altman would realize there had been some problem with the drug sale, and "[t]here was a serious risk that the hashish would be destroyed."[49]

These and other cases point out the fallacy in Ashe's argument that the officers in this case were unreasonable in believing that the failure of Glaser and Cricks to promptly return to Ashe's house with the money could create a substantial risk that Ashe would flee or destroy evidence. In any event, such determination does not in this case meet our clearly erroneous standard of review.

In similar regard, the dissent ascribes some importance to the fact that Glaser made her statements to Brown approximately thirty minutes after the officers saw Cricks leave Ashe's house. From this fact, the dissent concludes that the officers had sufficient probable cause for a search warrant when they first observed Cricks leave Ashe's residence and yet they "failed to send someone to obtain a warrant at that time." Not only is this issue and determination not before us for review, but there is no rationale requiring that this Court assume the role of fact finder by surveying the evidence and drawing inde-

---

45. *Id.* at 516 (emphasis added; citation omitted).

46. *See Glasby,* 576 F.2d at 737; *see also Acevedo,* 627 F.2d at 70.

47. 679 F.2d 187.

48. *Id.* at 192.

49. 797 F.2d at 515; *see also Moore,* 790 F.2d at 16; *Wulferdinger,* 782 F.2d at 1476; *Acevedo,* 627 F.2d at 71.

pendent conclusions as to weight, sufficiency, and effect.[50] We also find nothing in the record to encourage us to presume that the police were other than circumspect in the way they conducted the investigation and "organized the sale."

In any event, police delay before a warrantless search does not necessarily negate exigency of circumstance. In *United States v. Johnson*,[51] the Circuit Court of the District of Columbia, sitting en banc, held that even a half-hour to forty-minute delay before conducting a warrantless search of a house did not terminate the existence of probable cause or exigent circumstances.[52] Likewise, in *United States v. Gardner*,[53] the Fifth Circuit Court of Appeals held that even though agents knew in advance that the defendant was involved in the drug trade and that cocaine was likely hidden in his home, "the reasonableness of a search under exigent circumstances is not foreclosed by the failure to obtain a warrant at the earliest practicable moment."[54] Furthermore, that court more recently stated:

> The government is not compelled to effect an arrest upon the occurrence of probable cause to believe a crime has been committed. Rather, the government may await that move in the hope of ferreting out any hitherto unknown individuals involved in the illicit undertakings, gathering additional evidence substantiating the crimes believed to have been committed, or discovering any other

offenses in which the suspects are involved.[55]

■ Similarly, in the case at hand, the officers' failure to avail themselves of an earlier opportunity to obtain a warrant did not automatically preclude them from acting upon exigent circumstances arising thereafter.[56] And the fact that the exigency may have been foreseeable at the time the decision was made to forego or postpone obtaining a warrant does not control the legality of a subsequent warrantless search triggered by that exigency.[57]

Furthermore, in regard to the issue of exigency, greater significance exists in reviewing the time available for the officers to have obtained a search warrant once Glaser made her statements which indicated the whereabouts of the remaining cocaine and triggered the existence of probable cause and immediate exigency. In that regard, and under the facts of this case, there was no realistic opportunity to seek a search warrant before the exigencies of the matter made it necessary to enter the dwelling.

Finally, Ashe suggests the trial court held that merely seeing him move from a window justified the warrantless entry. However, this is not entirely correct. In its October 3, 1983 "Order Denying Defendant Ashe's Motion to Suppress," the trial court ruled that the following exigent circumstances supported the warrantless entry:

---

**50.** *See State v. Bolsinger*, 699 P.2d 1214, 1226–27 (Utah 1985) (Hall, C.J., dissenting).

**51.** 561 F.2d 832 (D.C.Cir.) (en banc), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977).

**52.** 561 F.2d at 842–44; *see also Delguyd*, 542 F.2d 346.

**53.** 553 F.2d 946.

**54.** *Id.* at 948 (citing *Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2471–72, 41 L.Ed.2d 325 (1974) (plurality opinion); *United States v. Mitchell*, 538 F.2d 1230, 1233 (5th Cir.1976) (en banc), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977)).

**55.** *United States v. Hultgren*, 713 F.2d 79, 87 (5th Cir.1983); *see also United States v. Thompson*,

700 F.2d 944, 950 (5th Cir.1983) (holding that the agents' failure to avail themselves of the first possible opportunity to obtain a warrant is not a fatal defect).

**56.** *See United States v. Webster*, 750 F.2d 307, 327 (5th Cir.1984), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985) (citing *Cardwell*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325).

**57.** *See Webster*, 750 F.2d at 327; *Hultgren*, 713 F.2d at 88. Although the issue is not properly before us, we would place an unwieldy burden upon the courts and law enforcement agencies if, in order for police officers to subsequently respond to exigent circumstances necessitating a warrantless search, we required them to attempt to procure a search warrant for every place a defendant may lead them while under surveillance.

(1) Defendant Glaser's statement to Agent Brown that the rest of the money was expected at the residence in a few minutes and that the transaction would be done at the doorway; [and]

(2) the undercover officer's observations of Kenneth Cricks going into the Ashe residence after he received the $500.00 and returning from said residence with one ounce of cocaine.

Importantly, all of these additional exigent circumstances not noted by Ashe were neither created nor avoidable by the officers and occurred before they arrested the codefendants and decided to approach and enter Ashe's residence.[58]

### III

Finally, Ashe argues that the trial court erred in denying his motion to suppress since no attempt was made by the officers to obtain a telephone warrant.[59]

While we do not decide whether the prosecution has the burden of proving the unavailability of a state telephone warrant in order to demonstrate sufficient exigent circumstances to justify a warrantless search,[60] numerous federal cases hold that proof of the unavailability of a telephone warrant is not required when the exigency is so immediate or great that it precludes recourse to any warrant procedures.[61] Such is the case here. As indicated above, at the time the officers entered Ashe's premises without a warrant, they had substantial cause to believe that destruction of evidence would occur before they could obtain a search warrant.[62] Indeed, it is evident that the time required to obtain a telephone warrant, however brief, was not available. The "clock began to run" when Cricks left Ashe's house with the cocaine to meet Glaser and complete the first phase of the transaction. It was impossible to know how many minutes could pass without arousing Ashe's concern. Because of the close proximity of the locations and what appears to be prearrangement of the transaction details, no delay beyond those few minutes required by the officers to arrest the conspirators and drive to Ashe's house could be considered safe.[63]

In contrast, Ashe suggests that the police had ample time to obtain a search warrant. Such contention implies that a simple phone call is all that is required to obtain a telephone search warrant in Utah. However, section 77–23–4(2) lists several prerequisites to obtaining a valid telephone search warrant:

(2) ... The sworn oral testimony may be communicated to the magistrate by telephone or other appropriate means and shall be recorded and transcribed.

**58.** The trial court's order denying Ashe's motion to suppress indicates that even without seeing Ashe at the window, Glaser's statements, together with other exigent circumstances, justified the warrantless entry.

**59.** Telephone warrants are provided for in Utah Code Ann. § 77–23–4 (1982). The government should actively encourage its law enforcement agents to seek search warrants whenever possible and by any available means provided by statute. Judicial officers should cooperate to the utmost in promoting this policy.

**60.** Ashe has not briefed the issue on appeal and cites no case law upholding the proposition that the State has the burden of proving the unavailability of a state telephone warrant, and absent meeting that proof, the trial court must find that the warrantless search violated Ashe's fourth amendment rights. Also, we note that not all federal cases explicitly hold that the prosecution must always establish that law enforcement officers could not have obtained a telephone warrant. *See, e.g., Manfredi,* 722 F.2d at 523

(government inexplicably failed to *introduce* evidence regarding time required to obtain a telephone warrant); *United States v. Berick,* 710 F.2d 1035, 1038 (5th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983) (government must *ordinarily* introduce evidence of time required to obtain a telephone warrant and the availability of that warrant); *United States v. McEachin,* 670 F.2d 1139, 1146 (D.C. Cir.1981) (courts must *consider* amount of time necessary to obtain a warrant by telephone in determining whether exigent circumstances exist).

**61.** *See, e.g., Manfredi,* 722 F.2d at 523; *Berick,* 710 F.2d at 1038–39; *Cuaron,* 700 F.2d at 589–90; *McEachin,* 670 F.2d at 1148.

**62.** As noted previously, the reasonableness of this conclusion is supported by substantial case law. *See supra* notes 10–20 and accompanying text.

**63.** *See Manfredi,* 722 F.2d at 523.

After transcription, the statement shall be certified by the magistrate and filed with the court. This statement shall be deemed to be an affidavit for purposes of this section.

(a) ... Prior to issuance of the warrant, the magistrate shall require the law enforcement officer or the prosecuting attorney who is requesting the warrant to read to him verbatim the contents of the warrant. The magistrate may direct that specific modifications be made in the warrant. Upon approval, the magistrate shall direct the law enforcement officer or the prosecuting attorney for the government who is requesting the warrant to sign the magistrate's name on the warrant. This warrant shall be called a duplicate original warrant and shall be deemed a warrant for purposes of this chapter. In such cases the magistrate shall cause to be made an original warrant. The magistrate shall enter the exact time of issuance of the duplicate original warrant on the face of the original warrant.[64]

In many respects, this procedure is similar to the detailed process required for issuance of a federal telephone warrant.[65] In this regard, many federal cases indicate that issuance of a telephone warrant can take significant time. Indeed, the Ninth Circuit Court of Appeals in *United States v. Hackett*[66] recognized that twenty to thirty minutes was insufficient time under the circumstances to procure a telephone warrant in compliance with Federal Rule of Criminal Procedure 41(c)(2).[67] This finding was based in part upon the fact that more than a simple telephone call is required in order to obtain a federal warrant based upon oral testimony.[68]

In the case at hand, the court below heard evidence indicating that Ashe's house was only two to five minutes away from where the parties met. Even assuming that the procedures for obtaining a telephone warrant had been in place,[69] there was no delay on behalf of the officers, and the existing circumstances required them to spend fifteen minutes after conspirator Glaser met Brown in the parking lot.[70] If the officers had waited even an additional twenty to thirty minutes to obtain a telephone search warrant, Crick's delay in returning to Ashe's house would have been forty-five minutes plus. Obviously, forty-five minutes is not "very quickly." While there may be sufficient time to obtain a state telephone warrant under some circumstances, the facts demonstrate that there was inadequate time to wait to obtain a warrant in the instant case.[71]

Accordingly, since neither ignorance or discomfort in obtaining a telephone warrant nor the failure to introduce evidence on the availability of the same alters the fact that exigent circumstances existed,[72] the officers' failure to obtain a telephone warrant in this case was not inappropriate,

---

**64.** Utah Code Ann. § 77–23–4(2) (1982).

**65.** *See* Fed.R.Civ.P. 41(c)(2); Notes of Advisory Committee on 1977 Amendments to Rules, U.S. C.S. Rules of Criminal Procedure, at 199–202 (1978).

**66.** 638 F.2d 1179 (9th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

**67.** *Id.* at 1184–85.

**68.** *Id.* at 1184; *see also Cuaron,* 700 F.2d at 590. In *Manfredi,* 722 F.2d at 523; *Wulferdinger,* 782 F.2d at 1476–77 (holding that there was insufficient time to procure a telephone warrant in compliance with California Penal Code sections 1526, 1528 (West 1982).

**69.** *See Wulferdinger,* 782 F.2d at 1476–77.

**70.** The record indicates that in that time, Glaser met with Brown; a wintergreen test was per-

formed; the remaining "buy" money was counted out as a signal to the surveillance team; Glaser was arrested; Brown removed his police radio out of his trunk to place it back in his car; Brown drove to the place where Cricks was being arrested; and the officers drove to Ashe's house.

**71.** Although in *State v. Lopez,* 676 P.2d 393, 397 (Utah 1984), this Court noted that according to the record a telephone warrant was obtained in twenty-four minutes, such time frame is not relevant to the case at hand, nor should it suggest that the circumstances herein were not sufficiently exigent to justify a warrantless search since the officers therein obtained a telephone warrant within twenty-four minutes.

**72.** *See McEachin,* 670 F.2d at 1148.

and the trial court was not clearly in error in denying Ashe's motion to suppress.

## IV

In finding no violation of Ashe's fourth amendment rights, we do not minimize the importance of that amendment's protection in shielding citizens from unwarranted intrusions. The strong constitutional preference for searches pursuant to warrants is clear. Only the emergency circumstances here justified the warrantless entry into Ashe's house.[73]

Because the trial court had substantial evidence before it to justify its refusal to suppress evidence, and due to the absence of clear error, we affirm Ashe's convictions and hold that under the circumstances outlined above, the trial court committed no error in denying his motion to suppress.

STEWART, Associate C.J., and HOWE, J., concur.

DURHAM, Justice (dissenting):

I dissent. The conviction should be reversed and the case remanded for a new trial without the disputed evidence. I believe that the trial court improperly denied appellant's suppression motion because the State failed to prove either sufficient exigency to justify the warrantless entry of appellant's residence or the unavailability of a telephone warrant. Unlike the majority, I think the facts as they appear in the officers' version support this conclusion, and I therefore reject the majority's assertion that reversal would require adoption of appellant's interpretation of events.

As the majority points out, the parties in this case failed to analyze the Utah Constitution's prohibition against unreasonable searches and seizures. In *State v. Earl*, we stated:

> We have not considered separate state constitutional standards, even though we are aware that other states are relying with increasing frequency on an analysis of the provisions of their own constitu-

tions to expand constitutional protection beyond that mandated by the United States Supreme Court.... It is imperative that Utah lawyers brief this Court on relevant state constitutional questions.

716 P.2d 803, 805–06 (Utah 1986). The parties' only reference to Utah Constitution article 1, section 14 appears on page six of appellant's brief where, in a footnote, he quotes the Utah constitutional provision and simply states, without analysis or citation to supporting case law, that the Utah Constitution provides the same protection as the fourth amendment to the United States Constitution. Because the parties failed to discuss any separate boundaries for the state constitutional provision, we restrict our analysis to the protections granted under the fourth amendment to the federal constitution. *State v. Dorsey*, 731 P.2d 1085, 1087 n. 2 (Utah 1986).

This case, however, presents an example of the need for state constitutional analysis independent of federal constitutional analysis. The cases cited in footnotes one and two of this opinion illustrate the confusion in the federal system on the issue of when the potential destruction of evidence justifies a warrantless search. Had the parties properly briefed the state constitutional question, we might have avoided traveling the tortuous paths paved by the federal courts in this area.

The majority begins its analysis by pointing out that this Court views the trial court's determination of a search's validity with a presumption of correctness. While this may accurately define the scope of review, I think the Court should also bear in mind both the well-established principle that a warrantless search is per se unreasonable and the policy considerations that have shaped that principle. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *Katz v. United States*, 389 U.S. 347, 357,

---

**73.** *See United States v. Rubin*, 474 F.2d 262, 270 (3d Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173,

38 L.Ed.2d 68 (1973).

88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *State v. Romero,* 660 P.2d 715, 717–18 (Utah 1983); *State v. Harris,* 671 P.2d 175, 178 (Utah 1983); *State v. Griffin,* 626 P.2d 478, 482 (Utah 1981) (Wilkins, J., concurring in the result). This is not a case requiring a review of the trial court's determination of the validity of a search based on a warrant, and we should not grant the same degree of deference to the trial court as we would in warrant cases because those searches already have a presumption of validity when they are challenged in the trial court.

The per se unreasonableness of warrantless searches stems from the preference for prior, neutral review of circumstances justifying an intrusion into a constitutionally protected area in lieu of permitting "the officer engaged in the often competitive enterprise of ferreting out crime" to make such a determination. *E.g., United States v. Karo,* 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984); *Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966); *see also Harris,* 671 P.2d at 180. The plain intent of this requirement is to remove the temptation from police officers to rationalize entry where the circumstances do not objectively justify it. When the search in question involves an intrusion into a person's private residence, the search warrant requirement becomes especially important because both the United States and Utah

constitutions specifically prohibit unreasonable intrusions into a person's home. U.S. Const. amend. IV; Utah Const. art. I, § 14. *See, e.g., Welsh,* 466 U.S. at 748, 104 S.Ct. at 2096.

The United States Supreme Court, federal Circuit Courts of Appeal, and this Court have all recognized exceptions to the fourth amendment warrant requirement. The courts have held, however, that "only in 'a few specifically established and well-delineated' situations ... may a warrantless search of a dwelling withstand constitutional scrutiny." *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). *See also Harris,* 671 P.2d at 178. One such exception arises where the delay required to obtain a warrant endangers the preservation of the evidence. *See, e.g., Schmerber,* 384 U.S. at 770, 86 S.Ct. at 1835. The prosecution bears the burden of proof to show that the circumstances of a particular case justify a warrantless search and seizure. *See Welsh,* 466 U.S. at 749–50, 104 S.Ct. at 2097–98.

The United States Supreme Court has not definitively stated the circumstances under which the federal constitution permits a warrantless search to prevent the potential destruction or removal of evidence,[1] and the federal circuit courts have adopted a variety of standards.[2] As I view

---

**1.** In *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the United States Supreme Court upheld the warrantless taking of a blood sample from a suspect eventually charged with driving under the influence. The Court justified the warrantless seizure of the evidence on the ground that "[t]he officer ... might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" *Id.* at 770, 86 S.Ct. at 1835. In *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), however, the Court distinguished *Schmerber* on the ground that the evidence in *Schmerber* was "in the process of destruction," *id.* at 35, 90 S.Ct. at 1972, thus implying that *Schmerber* only permitted warrantless searches where the officer knew that the evidence was actually in the process of destruction. *See* 2 W. LaFave, *Search and Seizure* § 6.5(a), at 655 (2d ed. 1987). The circuit courts, however, have

generally rejected the rigid standard implied in *Vale v. Louisiana,* 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970). *See, e.g., United States v. Rubin,* 474 F.2d 262, 267–68 (3rd Cir. 1973); 2 W. LaFave, *Search and Seizure* § 6.5(b), at 658 (2d ed. 1987); and cases cited in footnote 2.

**2.** *See, e.g., United States v. Satterfield,* 743 F.2d 827, 844 (11th Cir.1984) ("exigent circumstance doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to an urgent need for *immediate action*"); *United States v. Elkins,* 732 F.2d 1280, 1284 (6th Cir.1984) (warrantless entry justified when the surrounding circumstances would lead a person of reasonable caution to conclude that evidence would probably be found on the premises and that the evidence would probably be destroyed within the time necessary to obtain a search warrant) (citing *United States v. Delguyd,* 542 F.2d 346, 350–51 (6th Cir.1976)); *United States*

them, the circumstances facing the officers in this case did not permit the warrantless search and seizure under any of the standards.

In this case, the trial judge apparently adopted Officer Brown's version of what transpired, although he also relied heavily

*v. Harris,* 713 F.2d 623, 626 (11th Cir.1983) (where dealers seemed nervous and concerned when an undercover officer asked to leave, a significant possibility existed that the dealers would destroy the cocaine if the undercover officer did not return immediately; therefore, the warrantless search was justified); *United States v. Perez,* 700 F.2d 1232, 1237 (8th Cir. 1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 884 (1984) (the factual circumstances must establish a sufficient basis for an officer to believe someone in the residence will likely destroy the evidence and mere fear or apprehension of destruction does not suffice to justify the search); *United States v. Cuaron,* 700 F.2d 582, 586 (10th Cir.1983) (exigent circumstances exist where officers have reason to believe evidence may be destroyed before they can obtain a warrant and the court must "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers"); *United States v. Kunkler,* 679 F.2d 187, 191–92 (9th Cir.1982) (exigent circumstances exist where police officers who are acting in good faith and on probable cause, reasonably believe, in light of the totality of the circumstances, that evidence or contraband will imminently be destroyed); *United States v. McEachin,* 670 F.2d 1139, 1144 (D.C.Cir.1981) (warrantless search justified when, in light of all the circumstances facing the officer, the evidence faced imminent removal or destruction); *United States v. Williams,* 604 F.2d 1102, 1122–23 (8th Cir.1979) (case disposed of on lack of probable cause grounds; however, the court also stated that exigent circumstances exist where evidence is in imminent danger of destruction or removal and there exists a compelling need for official action and no time to secure a warrant); *United States v. Allard,* 600 F.2d 1301, 1304 (9th Cir.1979) (threatened destruction of evidence may give rise to sufficient exigent circumstances to justify a warrantless search, but an agent cannot justify a warrantless search solely on the basis of knowledge that contraband is on the premises); *United States v. Glasby,* 576 F.2d 734, 738 (7th Cir.), *cert. denied,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed. 2d 159 (1978) (pursuant to the facts of the case, agents could reasonably believe that the contraband was in the premises searched and could be destroyed easily, and no evidence existed showing that the agents acted in bad faith); *United States v. Shima,* 545 F.2d 1026, 1028 (5th Cir.), *cert. denied,* 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed. 2d 490 (1977) ("[i]mminent destruction, removal, or concealment of the property intended to be seized, or the likelihood of it[s] taking place

on appellant's appearance in the window to justify the warrantless search. In his memorandum decision, the trial judge stated that Glaser's statements alone could not justify the warrantless entry, but that her statements, combined with the officer's observation of appellant in the window, supported the entry.[3]

before a warrant can be obtained, may provide an exception" to the warrant requirement); *United States v. Guidry,* 534 F.2d 1220, 1223 (6th Cir.1976) (circuit court agreed with the ruling below that the totality of the circumstances confronting the officers indicated that efforts to destroy evidence were in progress and likely would be completed absent prompt police action); *United States v. Hayes,* 518 F.2d 675, 678 (6th Cir.1975) (in order to justify a warrantless entry, the government must present proof that the evidence sought was in danger of destruction or removal, and the possibility of destruction or removal is not enough); *United States v. Curran,* 498 F.2d 30, 35 (9th Cir.1974) (threat of imminent removal or destruction of evidence justifies a warrantless search); *United States v. Rosselli,* 506 F.2d 627 (7th Cir.1974) (government must prove the agents reasonably concluded the evidence would be destroyed or removed before they could obtain a search warrant; government failed to adequately explain why the agents did not even attempt to obtain a search warrant); *United States v. Rubin,* 474 F.2d 262, 268 (3d Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973) (warrantless entry justified where agents have probable cause to believe contraband is present and, based on the surrounding circumstances, they reasonably conclude the evidence will be destroyed or removed before they can secure a warrant); *United States v. Brown,* 457 F.2d 731, 734 (1st Cir.), *cert. denied,* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972) (warrantless search justified where substantial danger existed that evidence might be removed or destroyed); *United States v. Pino,* 431 F.2d 1043, 1045 (2nd Cir.1970), *cert. denied,* 402 U.S. 989, 91 S.Ct. 1675, 29 L.Ed.2d 154 (1971) (under the facts of the case, delay in obtaining a warrant would have greatly increased the likelihood that the evidence would either be destroyed or removed).

3. The judge's order denying the suppression motion does not cite appellant's appearance in the window as one of the factors supporting the warrantless entry; rather, it relies on Glaser's statements and the surveillance officer's observation of Cricks' entering the house and returning with an ounce of cocaine. The latter factor merely indicates, however, that the house contained the remaining evidence, not that anyone in the house could destroy that evidence. Therefore, the memorandum decision and order, when read together, indicate that the trial judge placed great significance on the officer's

It also appears that the trial judge relied on the totality of the facts known by the officers at the time they entered appellant's residence in making his determination that exigent circumstances justified the warrantless entry. The majority upholds the trial court's weighing of all the facts known to the officers at the time of entry and therefore holds that the trial court did not erroneously conclude that sufficient exigent circumstances justified the warrantless entry or that the officers created the final exigency on which the trial court relied in making its determination. I would reject this approach and adopt the Seventh Circuit's approach in *United States v. Rosselli*, 506 F.2d 627 (7th Cir. 1974), because it is a more realistic means of reviewing police conduct during warrantless searches. In *Rosselli*, the court "appraise[d] the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." *Id.* at 630.[4]

The officers in *Rosselli* followed Allen Anderson and watched him deliver a cardboard box to the defendant's apartment. They then followed Anderson to another apartment and observed Anderson carry another box into the second apartment. The officers entered the second apartment, arrested all but one of the occupants, and discovered that the cardboard box contained marijuana. After arresting the occupants of the second apartment and finding two more boxes of marijuana in Anderson's trunk, the officers decided to return to the defendant's apartment. On the way, Anderson told the officers that the box delivered to the defendant's apartment also contained marijuana. Instead of obtaining a search warrant, the officers went directly to the defendant's apartment, knocked on the door, and entered when they heard shuffling noises and a voice say, "Don't open the door for anybody."

At the suppression hearing, the government argued that sufficient exigent circumstances supported the warrantless search for two reasons. First, the occupant of the second apartment whom the officers had not arrested could have warned the defendant that the police were on their way. The court dismissed this contention summarily by stating that the police could have easily prevented a warning to the defendant by leaving one of the officers with the unarrested person.

Second, the government argued that the sounds heard at the door of the defendant's apartment justified the warrantless entry. The court rejected this argument as well. Although the circumstances viewed at the time of the entry would have likely supported a finding of sufficient exigent circumstances, the court analyzed the existence of exigency in light of the progression of events. The court held that the officers could have avoided the exigency created by their appearance at the defendant's door by obtaining a search warrant prior to approaching the defendant's residence, and they could not excuse their failure to do so by unnecessarily alerting the defendant to their presence.[5]

In this case, the trial judge did not determine when the officers had sufficient probable cause to obtain a search warrant; however, a justice of the peace could have reasonably determined that the officers had sufficient probable cause for a search warrant when they first observed defendant Ken Cricks leaving the Ashe residence.[6]

---

observation of appellant in the window in making his determination that exigent circumstances justified the search.

**4.** I do not assert that the trial judge cannot consider all the facts known at the time of the entry, merely that the judge hearing a suppression motion should look at the *progression* of the events leading up to the warrantless entry. Nothing in this opinion requires determining when the officers mentally developed the intent to search, ignoring events occurring thereafter.

Instead, I would require consideration of the progression of events and their impact.

**5.** This opinion cites *Rosselli* for the way a trial court should view the events in a suppression motion. That the facts in this case do not mirror those in *Rosselli* does not make our reliance on the standard of review in that case misplaced.

**6.** The majority states that we would "place an unwieldy burden upon the courts and law en-

At that time, the officers knew the following: (1) Glaser had arranged to sell a total of four ounces of cocaine to Officer Brown; (2) she had indicated from the beginning of the negotiations that the cocaine was in Park City;[7] (3) moments after she agreed to supply Officer Brown with an ounce for testing, surveillance officers, who were also aware of the negotiations with Officer Brown, observed her talking to Ken Cricks; and (4) the surveillance officers then followed Ken Cricks to appellant's residence. Even though five officers had accompanied Officer Brown to Park City and even though the Chief of Police of Park City had joined them, the officers failed to send someone to obtain a warrant at that time. Instead, the officers waited until after the arrests of Cricks and Glaser to discuss obtaining a warrant and then proceeded to appellant's residence after deciding that the exigencies of the situation did not permit seeking a warrant. Once there, they saw appellant in the upstairs window of his house, decided that he had become alerted to their presence, and determined that the exigency of the circumstances justified a warrantless entry of the house. As in *Rosselli*, the officers' own conduct in this case created the final exigent circumstance necessary to validate the warrantless search; therefore, they cannot rely on seeing appellant in the window to support their contention that the exigencies of the situation required a warrantless entry. *See Rosselli*, 506 F.2d at 630.[8]

Absent the appearance of appellant in the window, the officers had only Glaser's statement on which to rely in determining the necessity of a warrantless entry. Glaser, however, made this statement approximately thirty to forty minutes after the officers first saw Cricks leaving appellant's residence.[9]

Officer Brown testified that in his experience, it generally took one to two hours to obtain a search warrant; however, he also testified at the preliminary hearing that he did not consider the availability of a telephone search warrant as he was unfamiliar with the process necessary to obtain such a warrant. *See* Utah Code Ann. § 77–23–4(2) (1982). The purpose of the telephone warrant is to permit officers to obtain a search

forcement agencies if in order for police officers to subsequently respond to exigent circumstances necessitating a warrantless search, we required them to attempt to procure a search warrant for every place a defendant may lead them while under surveillance." I would not require such an absurd procedure. Consideration of the events as they progress, in place of looking at the sum of the events known at the time of the warrantless entry, necessitates only reasonable efforts to procure a warrant by police officers.

7. The majority argues that the officers had no advance warning of the location of the final sale; therefore, they could not have known that the events would become sufficiently exigent to justify a warrantless search until Glaser told them of the location. The record does indicate that Glaser did not tell Officer Brown that the rest of the deal would take place at the "door of the source" until her arrest; however, Glaser did tell him that the cocaine was in Park City, and the officers' plan required arresting Glaser and Cricks at the time she returned with the first ounce. They knew that at least one of them would have to return to retrieve the other three ounces. Thus, their lack of knowledge as to the location for completing the sale does not exonerate their failure to secure a search warrant. Because of the way Officer Brown had organized the sale, anyone who might have been in the house would have been alerted that something had gone wrong no matter where the sale would be completed.

8. The majority asserts that *United States v. Altman*, 797 F.2d 514 (7th Cir.1986), limits *United States v. Rosselli* and makes reliance on *Rosselli* misplaced because the facts in *Altman* more closely parallel the facts in this case than do the facts in *Rosselli*. I disagree. In *Altman*, unlike this case and *Rosselli*, the contact directed the police officer to drive to the house of his source before the sale was consummated. The officers then arrested the contact in full view of the occupied house of the source. In this case and in *Rosselli*, the arrests occurred at a location separate from the residence searched. The critical facts in *Rosselli* more closely parallel the facts in this case than do the facts in *Altman*.

9. I cite the delay as indicative of the overall police conduct in this case. The officers unjustifiably delayed trying to obtain a warrant until the events had progressed to the point where the circumstances did not permit obtaining one. The transcript of the preliminary hearing shows that the surveillance officers followed Cricks to the Ashe residence the first time more than thirty to forty minutes before arresting Glaser. It also shows that they never attempted to obtain a search warrant during this time.

warrant in less time than it would have taken to obtain a warrant in person and thereby facilitate the process in situations where time is of the essence.[10] Furthermore, the officers failed to consult the Park City Chief of Police about the time necessary to obtain any kind of search warrant in Park City, even though he was present during the discussion of the availability of a warrant.

This case does not involve a situation where someone could have warned Ashe about the impending search. *See United States v. Rosselli*, 506 F.2d at 630; *cf. United States v. Rubin*, 474 F.2d 262 (3rd Cir.1973). The officers had taken appellant's only two confederates into custody.

The majority cites *United States v. Delguyd*, 542 F.2d 346 (6th Cir.1976), and *People v. Williams*, 200 Colo. 187, 613 P.2d 879 (1980), as sufficiently factually similar to control this case. In those cases, however, the events leading to the warrantless searches and seizures arose too quickly and unexpectedly for the officers to have prepared for them. In *United States v. Delguyd*, officers waited for Delguyd at his home. When he arrived, a neighbor signaled to Delguyd, who drove off quickly and led the police on a high-speed chase that ended at the defendant's residence. Once there, police arrested Delguyd. Police already had information linking the defendant and Delguyd to the same criminal activity, and they observed someone in the defendant's house watching Delguyd's arrest. In *People v. Williams*, the transactions occurred outside the defendant's residence, where the defendant could view the events as they transpired. Moreover, the officers did not know the location of the residence until they followed the courier there.

Unlike the cases discussed above, the officers in this case had some advance notice of the location of the residence they subsequently searched. No one led them there unexpectedly in a situation that

would immediately alert the occupants of the officers' presence.

Furthermore, we are not bound by the majority's interpretation of the facts in *Delguyd* and *Williams*. Neither of these courts' rulings is controlling, and the cases have value only for the purpose of comparing different treatments of varying fact situations.

For the reasons stated above, I would hold that the State failed to prove circumstances sufficiently exigent to rebut the presumption of unreasonableness of the warrantless search. I do not suggest that it is clear on the record that the officers had ample time to obtain a search warrant, but rather emphasize that the facts in this case do not support a conclusion that exigency excused the officers' failure to seek one.

The State also failed to prove the unavailability of a telephone warrant. *United States v. Manfredi*, 722 F.2d 519 (9th Cir. 1983); *United States v. Berick*, 710 F.2d 1035 (5th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983); *United States v. Cuaron*, 700 F.2d 582 (10th Cir.1983); and *United States v. McEachin*, 670 F.2d 1139 (D.C.Cir.1981), all hold that in order to rebut the presumption of unreasonableness of a warrantless search the prosecution must prove that the officers could not have obtained a telephone warrant, as authorized by Federal Rule of Criminal Procedure 41(c)(2), before the evidence could be destroyed. *Manfredi*, 722 F.2d at 522; *Berick*, 710 F.2d at 1038; *Cuaron*, 700 F.2d at 589; *McEachin*, 670 F.2d at 1147. Although these cases deal with the availability of a federal telephone warrant, where a state statute also authorizes obtaining a state search warrant by telephone, it follows that the prosecution must also show that the officers could not have obtained such a warrant in order to demonstrate sufficient exigent circumstances to justify the warrantless search. In this case, the prosecution failed to present any evidence about the availability

---

**10.** The availability of a telephone warrant is discussed more thoroughly in the following section.

of a telephone warrant. Therefore, the State failed to meet its burden of proof, and the trial court erred in finding that the warrantless search did not violate the fourth amendment.

The courts in all four of the cases cited above found that there was no time for the officers to obtain a warrant by resorting to *any* procedure; therefore, the courts excused the government's failure to introduce proof on the unavailability of a telephone warrant. *Manfredi,* 722 F.2d at 523; *Berick,* 710 F.2d at 1038–39; *Cuaron,* 700 F.2d at 589; *McEachin,* 670 F.2d at 1148. In *Cuaron,* the court held such a failure excusable where the "critical nature of the circumstances clearly prevented the effective use of any warrant procedure." 700 F.2d at 589. In *McEachin,* the court held that the government must introduce proof of the unavailability of a telephone warrant unless "it is clear that the exigency in a ... case is so great that it precluded recourse to any warrant prodedure...." 670 F.2d at 1147.

The majority holds that the circumstances in this case prevented resorting to any warrant procedure; therefore, the State's failure to prove unavailability of a telephone warrant does not require reversal. The majority bases this determination on the ground that the officers only had a few minutes after the arrest of Cricks and Glaser to get to appellant's residence and prevent the destruction of evidence. As I have already discussed, I believe the proper starting point for reviewing the events is the time the officers first saw Cricks enter appellant's house. This occurred thirty to forty minutes prior to Glaser's arrest. While I agree with the majority that obtaining a telephone warrant requires adherence to several statutory procedures, I also think that the evidence does not clearly establish that the officers could not obtain a warrant before conducting their search. *See State v. Lopez,* 676 P.2d 393, 397 (Utah 1984) (after complying with all the statutory prerequisites, police officers obtained

a telephone warrant in twenty-four minutes).[11]

I also think that the majority's holding is wrong from a policy standpoint for two reasons. First, not suppressing the evidence in this case will encourage law enforcement officers to wait until the last possible minute to seek a warrant and then excuse their failure to do so when the exigencies that arise during their delay require a warrantless entry. In this case, the officers did not consider obtaining a search warrant until after Glaser's arrest. They did not alert Park City authorities that they may need a warrant, nor did they attempt to obtain a warrant when they followed Cricks to the Ashe residence, even though, according to their own testimony, they went to Park City to complete the sale of four ounces of cocaine which Glaser had told them was located there. Thus, failure to suppress the evidence in this case rewards the officers for their delay in obtaining a search warrant until the circumstances had evolved to a state of urgency, without ever requiring them to offer an excuse for the delay. I cannot agree with this position.

Second, the failure to suppress the evidence in this case rewards the officers for not seeking a telephone warrant. A telephone warrant balances the interests of prior, neutral authorization for a search and the need to conduct a search quickly in order to prevent destruction or removal of evidence. Two of the officers in this case testified that they did not attempt to obtain a telephone warrant because they did not feel "qualified" to do so, without offering any other excuse for the failure. Because I do not think the facts clearly show that they could not have obtained such a warrant, and because the purpose of telephone warrants is to expedite the warrant process in cases such as this, I would suppress the evidence. Failure to do so encourages continued ignorance of this important process.

In short, I think the majority improperly upholds the trial court's refusal to sup-

---

**11.** *Lopez,* of course, does not stand for the proposition that police officers can always obtain a telephone warrant in twenty-four minutes or

fewer. I cite the case merely as an illustration that a telephone warrant expedites warrant procedures.

press the disputed evidence. The officers in this case made no attempt to obtain a search warrant. For the reasons discussed above, I do not think that the circumstances justified this failure.

ZIMMERMAN, J., concurs in the dissenting opinion of DURHAM, J.